[No. F014382. Fifth Dist. Nov. 27, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES S. HESTON, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication. The portions directed to be published follow.*

472

## Counsel

Robert Valencia, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Shirley A. Nelson and Laura I. Heidt, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

ARDAIZ, Acting P. J.—An information filed May 3, 1990, charged Charles S. Heston with "VIOLATION OF SECTIONS 211/212.5(b) OF THE PENAL CODE, a felony. The said defendant, on or about March 19, 1990, did willfully and unlawfully aid and abet in the robbery of STEVE MURPHY." The information further alleged that in the commission of this offense, Heston (1) "furnished ARMANDO AVINA with a firearm for the purpose of enabling him to commit a robbery, within the meaning of Penal Code section 12022.4"; (2) "did intentionally aid and abet in the taking of property of a value exceeding One Hundred Thousand Dollars, ($100,000.00), within the meaning of Penal Code Section 12022.6(b)," and (3) "a principal, namely ARMANDO AVINA, was armed with a firearm within the meaning of Penal Code Section 12022(a)(1)."

On July 3, 1990, a jury convicted Heston of second degree robbery and found true all enhancement allegations. On July 31, 1990, the court denied probation and sentenced Heston to prison for a total of nine years: the five-year upper base term for robbery, plus two-year additional terms for the firearm furnishing and great taking enhancements. On the same date, Heston filed his notice of appeal from the judgment.

### FACTS

Although this appeal follows a five-day jury trial, Heston raises only sentencing issues. Thus an abbreviated version of the pertinent facts will suffice.

Heston worked as the chief of security for Chihuahua, Inc., in Fresno for approximately two years until February of 1990, when he was given the opportunity to resign or be terminated. A dispute had arisen over whether he had paid for meat obtained at an employee discount through the company delicatessen. He chose to resign.

On Saturday, March 10, 1990, Heston's 20-year-old nephew, Armando Avina, traveled to Fresno from Salinas with Heston's sister to attend a family baptism. Avina had not seen Heston in nine or ten years. When Heston inquired whether he was interested in making some money, Avina replied he was. Over the next few days Heston explained to Avina that all Avina would have to do was approach an unarmed Chihuahua security guard, Steve Murphy, and snatch his money bag as he was approaching the Union Bank in Fresno to make a deposit. Heston was Murphy's supervisor before he left Chihuahua's employ. Heston used to make the bank deposits when he was head of security and knew that the Monday deposit was the most substantial bank deposit of the week because it accounted for three days' receipts.

Avina returned to Salinas but came back to Fresno on Thursday, March 15, 1990. The next morning Heston drove Avina to the area around Union Bank in Fig Garden Village to show him the planned escape route and to point out the Chihuahua security guard when he arrived to make the Friday deposit. Avina studied the security guard from a distance with Heston's binoculars, and saw him again later in the day in front of Chihuahua. On Sunday night Heston told Avina he (Avina) would be carrying a .22-caliber revolver during the heist and showed him the weapon. Heston told Avina to "show the gun to the guard, and that he would get scared and give [Avina] the money bag."

On Monday morning Heston gave Avina the loaded revolver and extra bullets before they left Heston's house and told Avina to put them in the car. They drove to the Union Bank and arrived in time to see Murphy parking in front of the bank. Avina jumped out with the gun, and reached Murphy just as he was locking his car. Avina put Murphy in a headlock and shot him in the stomach. Murphy had the money bag in his right hand and mace in his left hand but it all happened so quickly he could not respond. According to Avina, Murphy turned and hit Avina with his elbow once he had hold of Murphy. Avina panicked when he thought Murphy was reaching for a "black stick" and shot him. Avina grabbed the money ($147,259.45) and ran to the rendezvous point but Heston pulled away without waiting for him when he saw Avina was being pursued.

Witnesses immediately contacted a nearby police officer. A pursuit followed and Avina surrendered a short time later in a nearby residential neighborhood. He admitted his involvement and implicated Heston who was taken into custody later that day at his home.

Murphy was unable to identify his assailant. He was hospitalized for a month and underwent two surgeries.

Avina entered a guilty plea, testified against Heston at his trial and was sentenced shortly after the instant trial to an eight-year prison term.

*Sentencing Hearing,* I, II*

. . . . . . . . . . . . . . . . . . . . . . . . .

### III.

*Was the Evidence Insufficient to Support the Gun-furnishing Allegation?*

 Heston contends the record does not support the gun-furnishing allegation because the evidence demonstrates he furnished the gun to Avina before the act of robbery was committed.

Penal Code section 12022.4† provides in pertinent part:

"Any person who, during the commission or attempted commission of a felony, furnishes or offers to furnish a firearm to another for the purpose of aiding, abetting, or enabling that person or any other person to commit a felony shall, in addition and consecutive to the punishment prescribed by the felony or attempted felony of which the person has been convicted, be punished by an additional term of one, two, or three years in the state prison. . . ."

Heston argues that under the express language of section 12022.4 the gun must be transferred during the actual commission of the crime. Thus, if the gun is furnished prior to the crime actually being committed, it was not furnished "during the commission or attempted commission of a felony."

A literal reading of the statute would arguably result in the interpretation urged by Heston. He reminds us that each word of a statute must be given full effect and significance. (*People* v. *Black* (1982) 32 Cal.3d 1, 5 [184 Cal.Rptr. 454, 648 P.2d 104].) Any construction of a statute making "'some words surplusage is to be avoided.'" (*In re Keith T.* (1984) 156 Cal.App.3d 983, 987 [203 Cal.Rptr. 112].) Under general principles of statutory construction "'when statutory language is clear and unambiguous, "there is no need for construction, and courts should not indulge in it."'" (*Farnow* v. *Superior Court* (1990) 226 Cal.App.3d 481, 485 [276 Cal.Rptr. 275], quoting *Hutnick* v. *United States Fidelity & Guaranty Co.* (1988) 47 Cal.3d 456, 464 [253 Cal.Rptr. 236, 763 P.2d 1326], quoting *Solberg* v. *Superior Court* (1977) 19 Cal.3d 182, 198 [137 Cal.Rptr. 460, 561 P.2d 1148].)

---

*See footnote, *ante,* page 471.

†All further statutory references are to the Penal Code unless otherwise indicated.

However, this rule of strict construction is tempered by realistic assessment of the consequences of such construction. Where such construction would result in an absurdity we must look beyond the words to the intent.

"On the other hand, '[t]he meaning of the words of a statute or, to use the alternative approach favored by many courts, the intent of the Legislature, can only be determined with reference to the context in which the words are used; that is, with reference to such purpose as may be discerned from examining the entire enactment of which the words are part. . . . Thus, "in analyzing the legislative usage of certain words, ' " 'the objective sought to be achieved by a statute as well as the evil to be prevented is of prime consideration . . . .' " ' [Citations omitted.]" . . . The courts resist blind obedience to the putative "plain meaning" of a statutory phrase where literal interpretation would defeat the Legislature's central objective.' [Citation.] ' "[E]very statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect. [Citations.]" ' [Citations.] *The words of a statute will not be literally construed if this would cause an absurd result, or if it would fail to give effect to the manifest purposes of the statute in light of its legislative history.'* [Citations.] Finally, legislative history, including the reports of legislative committees and commissions, may be considered in determining the purpose and meaning of a statute. [Citations.] . . ." (*Farnow* v. *Superior Court, supra,* 226 Cal.App.3d at p. 486, italics added.)

██ Under Heston's construction the statute would be applicable only under very narrow circumstances. Specifically, the firearm would have to be furnished during the actus reus element of the felony. This would be, for example, during the "taking" of the property in a robbery or during the specific act that completed the "attempt" aspect of an unsuccessful robbery. Under Heston's construction the only circumstance that would support a true finding would be one where during the taking the individual furnished a firearm to his coparticipant because he forgot to bring his gun. The issue might well be decided on whether or not the transfer of the gun took place outside the door of a liquor store to be robbed or once the threshold had been crossed. While we would acknowledge that the Legislature might direct a proscription against such specific conduct, we also observe the obvious— that such specifically proscribed conduct is so unlikely to occur in the manner contemplated as to render the statute useless. Its applicability would be akin to a law that only applied to people named Heathcliff who committed specific conduct on the third Thursday in February. We conclude such an interpretation rendering the usefulness of the statute virtually nonexistent compels an examination of the legislative purpose of the statute.

Section 12022.4 is the result of Senate Bill No. 428 (1985-1986 Reg. Sess.) carried by Senator Davis. The bill was a response to *People* v. *Miley*

(1984) 158 Cal.App.3d 25 [204 Cal.Rptr. 347]. In *Miley*, the defendant solicited, inter alia, the murder of his estranged wife and her two children. Subsequently, the defendant gave the assailant (who was working undercover for the police) a pistol to be used in the crime. At trial, the defendant was convicted of solicitation of murder and a violation of section 12022, subdivision (a), for being armed in the commission of a felony. The section then provided "[a]ny person who is armed with a firearm in the commission . . . of a felony shall, upon conviction . . . in addition and consecutive to the punishment prescribed for the felony . . . be punished by an additional term of one year. . . ."

The reviewing court affirmed the conviction for the underlying offenses and struck the arming allegation.

"A person is 'armed' within the meaning of section 12022, subdivision (a) when he carries a weapon as an instrument of offense or defense at the time of the commission of the felony. [Citations.]

"The purpose of the section has been explained by the Supreme Court: 'armed' felons are considered more dangerous, and therefore punished more severely, because of the potential harm they pose to their victims and to those who might attempt to interrupt the commission of their crimes. [Citation.]

"Appellant was not armed with the gun as a 'means of offense or defense' at the time of the *solicitation*. As the trial court noted, the increased risk of harm was to the projected victim of the crime which was being solicited and not to any person present at the time the crime of solicitation was being committed. That potential harm is too remote to call into play the enhanced sentence provisions of Penal Code section 12022, subdivision (a)." (*People v. Miley, supra,* 158 Cal.App.3d at p. 32, italics in original.)

Noting the increased culpability for having supplied the gun, the reviewing court held:

"Appellant's purpose in having the gun on October 15 was to insure that *Douglas would be 'armed'* when he went to kill Carole. As the trial court noted, the appropriate offense or enhancement in appellant's case would be 'furnishing' a gun. California, however, has no such statute, and courts cannot compensate for the omissions of the Legislature by stretching statutes beyond their reasonable and intended application. . . ." (*People v. Miley, supra,* 158 Cal.App.3d at p. 33, fn. omitted, italics in original.)

*Miley* clearly directs itself to the absence of legislation punishing the act of knowingly "furnishing" a firearm to be used in a felony. In response to the

legislative lacuna in the law, the Ventura District Attorney proposed specific legislation.

As originally introduced on February 14, 1985, Senate Bill No. 428 created a new substantive felony, punishable by four, six, or eight years, for "[furnishing or offering] to furnish a firearm to another person for the purpose of aiding, abetting, or enabling that person or any other person to commit a crime . . . ." On March 18, 1985, Senate Bill No. 428 was amended in the Senate to create a new two-year enhancement for furnishing a firearm "during the commission or attempted commission of a felony," for the purpose of aiding or abetting "that felony." However, the bill was then amended in the Senate on April 10, 1985, to provide the two-year enhancement for furnishing or offering to furnish a firearm during the commission of a felony, for the purpose of aiding or abetting "a felony." After further amendment, Senate Bill No. 428 was enacted and signed into law. (Stats. 1985, ch. 463, § 4, p. 1784.)

The evident purpose of the statute is to punish and deter an individual from knowingly furnishing a gun to be used in the commission of a felony. The contemplated harm of such conduct is evident. A firearm substantially increases the risk of harm attendant to the commission of any crime. What the Legislature sought to do, and repeatedly emphasized, is well stated in the statement of purpose to Senate Bill No. 428 as presented to the Senate Committee on Judiciary in its review of the statute:

"PURPOSE

"Existing law does not expressly provide punishment for the furnishing of a firearm to another for the purpose of committing a crime, although the furnishing may be considered in determining whether the person is convicted as a principal in the commission of the underlying crime.

"This bill would impose a two year enhancement on the sentence for the underlying offense for furnishing or offering to furnish a firearm to another for the purpose of aiding, abetting, or enabling that person or any other person to commit a felony.

"The purpose of this bill is to respond to an appellate court decision that suggested it would be appropriate to make furnishing a gun an offense or an enhancement."

The factual restrictiveness of Heston's construction of section 12022.4 would fall within the concerns expressed by the Legislature in seeking to

deter the furnishing of a gun. However, the narrow application would remove any realistic effectiveness. We conclude "during the commission or attempted commission of a felony" must be read as contemplating a time frame other than simply the time of the actual act element of the felony.

■ " ' "The mere literal construction of a section in a statute ought not to prevail if it is opposed to the intention of the legislature apparent by the statute; and if the words are sufficiently flexible to admit of some other construction it is to be adopted to effectuate that intention. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act." ' " (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049].)

In this regard, we find analogous language in section 189 referring to felony murder. Section 189 designates as first degree murder, "[a]ll murder . . . which is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery . . . ." In *People* v. *Chavez* (1951) 37 Cal.2d 656 [234 P.2d 632], the defendant argued that to "bring a homicide within the terms of section 189 of the Penal Code, the killing must have occurred 'while committing,' 'while engaged in,' or 'in pursuance' of the named felonies, and that the killing must have been 'a part of' the felony or attempted felony 'in an actual and material sense, and have resulted as a natural and probable consequence thereof.' " (*Id.* at p. 669.)

"The statute was adopted for the protection of the community and its residents, not for the benefit of the lawbreaker, and this court has viewed it as obviating the necessity for, rather than requiring, any technical inquiry concerning whether there has been a completion, abandonment, or desistence of the fenoly [*sic*] before the homicide was completed.

"In *People* v. *Boss*, 210 Cal. 245, 252, 253 [290 P. 881], this court said that the felony murder rule '. . . was adopted to make punishment of this class of crime more certain. It was not intended to relieve the wrongdoer from any probable consequences of his act by placing a limitation upon the *res gestae* which is unreasonable or unnatural.' The homicide is committed in the perpetration of the felony if the killing and felony are parts of one continuous transaction. [Citation.] Likewise, the homicide was said to be murder in the first degree when it occurred during a 'continuous integrated attempt to successfully escape after the perpetration of the robberies.' [Citation.] In that case the robberies took place a considerable time before the fatal beating was administered for the purpose of preventing discovery of the previously committed felony." (*People* v. *Chavez, supra,* 37 Cal.2d at pp. 669-670.)

■ We therefore conclude that "during the commission or attempted commission of a felony" necessarily encompasses a period of time greater

than the span of the act element of a felony for purposes of the statute. Such a conclusion is consistent with the legislative intent to deter a firearm from being furnished and to increase the punishment for one who furnishes the firearm. Further, our definition of the terminology is consistent with analogous interpretations of "perpetrate" and "perpetration." █ The word *commit* means "to do or perpetrate (an offense or crime)." (Webster's New World Dict. (2d college ed. 1982) p. 286.)

█ Further, we determine that the relevant time spent encompassed by "during the commission or attempted commission of a felony" refers to the furnishing and the actual committing of the felony being two acts that are part of one continuous transaction or course of conduct. Such interpretation gives effect to the stated intent of the Legislature in passing section 12022.4 and gives meaning to the terminology it has used.

In the instant case, the evidence is overwhelming that Heston furnished the firearm to Avina at the time the two men left to commit the crime before us. Heston did exactly what the Legislature was concerned about: he knowingly furnished a firearm to another person to use in a felony. The consequence was exactly the harm the Legislature sought to deter—the victim was severely wounded.

While section 12022.4 arguably would not encompass the furnishing of a firearm for use in a felony where the furnishing occurred several days prior to the crime, we are not called upon to resolve that issue in this case. The Legislature has seen fit to restrict the scope of the statute to a specific time frame. That is its prerogative. Our obligation is to interpret the statute in order to effectuate its purpose. We find the violation of section 12022.4 supported by substantial evidence that it occurred during the continuous transaction leading to the crime itself. It, therefore, occurred "during the commission" of the robbery.

The judgment is affirmed.

Harris, J., and Buckley, J., concurred.