[No. S047206. Aug. 26, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD JAMES MASBRUCH, Defendant and Appellant.

## COUNSEL

Wesley A. Van Winkle, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, W. Scott Thorpe and Ruth M. Saavedra, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CHIN, J.**—We here determine the applicability of enhancements under Penal Code section 12022.3, subdivision (a) (§ 12022.3(a)),[1] for "use[]" of a firearm "in the commission of" a crime, to sex offenses that a defendant commits after initially displaying a firearm. This issue has divided the Courts of Appeal. We conclude that the Court of Appeal here properly found that defendant used a firearm in the commission of rape and sodomy. We therefore affirm the judgment of the Court of Appeal.

### I. FACTS AND PROCEDURAL BACKGROUND

Mary K. and her mother, Marietta K., lived in an apartment complex in Fresno, California. Mary had managed the complex for over 10 years. At

---

[1] All further statutory references are to the Penal Code.

approximately 5 p.m. on April 2, 1991, defendant Richard James Masbruch came to the door to apply for an apartment. Mary gave defendant an application form to fill out and invited him into the apartment to get his name and phone number.

As defendant and Mary walked into the living room, defendant turned around and pointed a gun at her face. He told her to put her hands up and give him her purse. Mary explained she did not have a purse, and defendant asked to see her checkbook. Mary complied. Defendant set the checkbook down and told Mary to go into the kitchen. She assumed the gun was pointed at her head. He told her to lie facedown on the kitchen floor and tied her hands and feet with telephone cord. He then "hog-tied" her, tying her hands and feet together.

Marietta, Mary's mother, then came downstairs. Defendant "polite[ly]" told her, "Your daughter wants to see you in the kitchen." Marietta responded, "Oh, I wonder what she wants." As Marietta entered the kitchen, she saw Mary on the floor, and said, "Oh, my God." Mary told her, "Just do whatever he says to do, because he has a gun."

Defendant sat Marietta on a kitchen chair and tied her hands and feet with a cloth parrot cage cover. He then said he wanted jewelry and money. The two women directed defendant to various locations of the house. After exploring each proposed area, defendant returned to the kitchen, and the women suggested another location. They "figured if [they] cooperated that he wouldn't kill [them]. When he would go upstairs, [they] would talk and think of different places where money might be, so if he got enough that he would just leave [them] alone." Mary "could only really see [defendant's] feet" during most of this period.

Defendant then blindfolded the women. Mary noticed that "[i]t was quiet for awhile." Defendant then turned Mary on her side. "[I]t felt like he had taken a butcher knife and started at [her] knee and just ran it as slow as he could all the way down to [her] ankle. [She] was screaming, because it was . . . the most excruciating pain you could think of. It was like to the bone. [She] kept waiting to feel the fluid of the blood coming out and [she] didn't feel it and [she] didn't know what he'd done." Defendant had apparently spliced several electrical cords together and shocked Mary with this makeshift instrument. Defendant also shocked Marietta's right arm. After he finished, defendant said, "That's a warning to show you what I can do to you."

Defendant "unhogtied" Mary and went through her pockets for money. He then unzipped her pants. Mary said, "You're not going to rape me?"

Defendant said, "Shut up." He forced his penis into her vagina. He complained that Mary "wasn't cooperating," and used his hands to stretch her vaginal area apart. He then sodomized her.

After the assault, Mary's blindfold came off her left eye, enabling her to "see partially." Defendant began smoking, swearing, and throwing objects. Mary testified, "I thought he was going to kill us then." He "was in the butcher knife drawer." She "figured maybe his gun broke or something," and "was afraid . . . he was going to slit [their] throats." Instead, defendant gagged Mary, threatened to kill the women if they ever called the police, and left. Mary did not see the gun again after defendant first pointed it at her. After discovering that she was bleeding profusely, Mary called the police.

The jury found defendant guilty of rape (§ 261, subd. (a)(2)), sodomy (§ 286, subd. (c)), first degree burglary (§§ 459, 460), two counts of residential robbery (§§ 211, 212.5, subd. (a)), two counts of false imprisonment (§ 236), and two counts of torture (§ 206). It further found that defendant used a firearm (§ 12022.3(a))[2] and inflicted great bodily injury (§ 12022.8) in the commission of the rape and the sodomy, and that he personally used a firearm (§ 12022.5, subd. (a) (§ 12022.5(a))) in the commission of the burglary, robberies, and false imprisonment. The jury also found that defendant committed the burglary and one of the robberies against a person 60 years of age or older, and that he inflicted great bodily injury upon that person. (§ 1203.09.)

The court sentenced defendant to serve two consecutive life terms for the torture counts, to be served following a total determinate term of forty-five years and four months for the other offenses and enhancements. As relevant here, the sentence included two 4-year enhancements under section 12022.3(a) for use of a firearm in the commission of the rape and sodomy. The court also imposed a $10,000 restitution fine and an additional $100 fine under section 290.3.

The Court of Appeal reversed the great bodily injury enhancement as to the sodomy count and reduced the restitution fine to $200. In all other

---

[2]The court had instructed: "It is alleged in Counts One and Two that the defendant personally used a firearm in the commission of rape and sodomy pursuant to Penal Code Section 12022.3(a). If you find the defendant guilty of either of these charges, you must determine whether or not the defendant personally used a firearm in the commission of such crime. [¶] . . . [¶] The term 'used a firearm,' as used in this instruction, means to intentionally fire a firearm, to intentionally strike or hit a human being with a firearm, or to display a firearm in conjunction with a threat that it will be used. [¶] The People have the burden of proving the truth of this allegation. If you have a reasonable doubt that it is true, you must find it not to be true."

respects, it affirmed the judgment. We granted defendant's petition for review.

## II. Discussion

■ Defendant contends that there is insufficient evidence to support the enhancements under section 12022.3(a) for use of a firearm in the commission of the rape and sodomy. Specifically, he asserts that he did not "use" the gun "in the commission of" the sex offenses because he displayed it only at the outset of his criminal activity, approximately one hour before he committed the sex offenses, and he left Mary several times during the interim to commit crimes in other parts of the house. We disagree.

At the time of defendant's crimes, section 12022.3(a) provided in relevant part: "For each violation of Section 261 [rape], . . . 286 [sodomy], . . . and in addition to the sentence provided, any person shall receive an enhancement (a) of three, four, or five years if the person *uses* a firearm or any other deadly weapon *in the commission of* the violation . . . ."[3] (Stats. 1989, ch. 1167, § 3, p. 4529, italics added.) The relevant language, i.e., "uses" and "in the commission of," also appears in two other weapon use enhancement statutes. (See §§ 12022, subd. (b) (§ 12022(b))[4] and 12022.5(a).[5]) These three provisions are part of "The Dangerous Weapons' Control Law." (§ 12000 et seq.; see *People* v. *Bland* (1995) 10 Cal.4th 991, 996 [43 Cal.Rptr.2d 77, 898 P.2d 391].) "The intent of the Legislature in enacting the firearm use enhancement . . . was 'to deter the use of firearms in the commission of violent crimes by prescribing additional punishment for each use.' [Citations.]" (*People* v. *Fierro* (1991) 1 Cal.4th 173, 225-226 [3 Cal.Rptr.2d 426, 821 P.2d 1302]; see § 1170.1, subd. (i).) ■ Section 12022.3(a) applies even though the firearm was unloaded or inoperable at the time of the crime. (See *People* v. *Bland, supra,* 10 Cal.4th at pp.

---

[3] This subdivision now provides for a three-, four-, or ten-year enhancement.

[4] At the time of defendant's crimes, section 12022(b) provided in relevant part: "Any person who personally uses a deadly or dangerous weapon in the commission or attempted commission of a felony shall, upon conviction of such felony or attempted felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term of one year, unless use of a deadly or dangerous weapon is an element of the offense of which he or she was convicted. . . ." (Stats. 1989, ch. 1284, § 2, p. 5058.)

[5] At the time of defendant's crimes, section 12022.5(a) provided in relevant part: "[A]ny person who personally uses a firearm in the commission or attempted commission of a felony shall, upon conviction of such felony or attempted felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term of imprisonment in the state prison for three, four, or five years, unless use of a firearm is an element of the offense of which he or she was convicted. . . ." (Stats. 1990, ch. 41, § 3, p. 246.)

1004-1005 [§ 12022, subd. (a)(2), applicable although gun unloaded]; *People* v. *Nelums* (1982) 31 Cal.3d 355, 358-360 [182 Cal.Rptr. 515, 644 P.2d 201] [§ 12022, subd. (a), applicable although firearm inoperable]; *People* v. *Steele* (1991) 235 Cal.App.3d 788, 795 [286 Cal.Rptr. 887] [§ 12022.3(a) applicable although firearm unloaded].)

■ Whether a defendant "used a firearm in the commission of" an enumerated sex offense is for the trier of fact to decide. (*People* v. *Najera* (1972) 8 Cal.3d 504, 510 [105 Cal.Rptr. 345, 503 P.2d 1353], fn. omitted, disapproved in part by *People* v. *Wiley* (1995) 9 Cal.4th 580, 587-588 [38 Cal.Rptr.2d 347, 889 P.2d 541] [*Najera* correctly construed statute, but not California Constitution, to require jury to decide weapon use allegation].)

■ As we have explained: "By employing the term 'uses' [in section 12022.5] instead of 'while armed' the Legislature requires something more than merely being armed. [Citation.] . . . Although the use of a firearm connotes something more than a bare potential for use, there need not be conduct which actually produces harm but *only conduct which produces a fear of harm or force by means or display of a firearm in aiding the commission of one of the specified felonies.* 'Use' means, among other things, '*to carry out a purpose or action by means of,*' to '*make instrumental to an end or process,*' and to '*apply to advantage.*' [Citation.] The obvious legislative intent to deter the use of firearms in the commission of the specified felonies requires that 'uses' be broadly construed." (*People* v. *Chambers* (1972) 7 Cal.3d 666, 672 [102 Cal.Rptr. 776, 498 P.2d 1024], italics added.) We concluded in *Chambers* that the defendant, who had pointed a gun at the victim and demanded money, "utilized the gun *at least as an aid in completing an essential element of the crime of robbery*—the taking of personal property 'accomplished by means of force or fear.' (§ 211.) The facts [were] more than sufficient to support a finding that defendant used a firearm within the meaning of section 12022.5 in the commission of the offense." (*People* v. *Chambers, supra,* 7 Cal.3d at pp. 672-673, italics added.)

Our decision in *Chambers* preceded the enactment of section 12022.3(a). However, the language of section 12022.5 construed in *Chambers* is substantially similar to that of section 12022.3(a). "Where a statute is framed in language of an earlier enactment on the same or an analogous subject, and that enactment has been judicially construed, the Legislature is presumed to have adopted that construction. [Citation.]" (*People* v. *Harrison* (1989) 48 Cal.3d 321, 329 [256 Cal.Rptr. 401, 768 P.2d 1078].)

■ Here, defendant concedes that he used the gun in the commission of the theft offenses. However, citing *People* v. *Funtanilla* (1991) 1 Cal.App.4th 326 [1 Cal.Rptr.2d 875], he challenges the enhancements for gun use in the

commission of the sex offenses. In *Funtanilla*, two 15-year-old female cousins accompanied three male acquaintances to defendant's home. Defendant lured one of the girls to a bedroom, put a gun to her head, and raped her. He then left the room. She "dressed and sat in the bedroom crying," and sought help from an acquaintance who entered the room. (*Id.* at p. 329.) He declined because the men " 'were his friends.' " (*Id.* at p. 330.) Defendant returned, "dressed in his undershorts and told her to take her clothes off." (*Ibid.*) She did not see a gun, but submitted to further sex acts because she was frightened. Defendant raped her again, and twice forced her to perform oral copulation. He then left the room. Five minutes later, as she was dressing, another acquaintance "entered the bedroom, forced her back onto the bed and raped her." (*Ibid.*)

The Court of Appeal reversed the jury's finding that the defendant used a weapon in the commission of the second rape, two acts of oral copulation, and the rape in concert. (*People* v. *Funtanilla, supra*, 1 Cal.App.4th at pp. 333-334; § 12022.3(a).) The court stated that "[t]he meaning of 'in the commission' varies depending on the nature of the offense. Theft crimes such as burglary, robbery and receiving stolen property have been held to remain ongoing beyond the time of the physical conduct constituting the offense until the time the felon has reached a place of temporary safety. [Citations.] . . . [¶] Unlike theft or homicide offenses, the completion of a sex offense has been narrowly defined in order to avoid the multiple punishment proscription of section 654 and to permit imposition of multiple punishment of a defendant who commits multiple sex offenses against a single victim. [Citation.] Each criminal sexual act, even when one follows another in rapid, uninterrupted succession, is considered a discrete and segregated crime, to which the single intent and objective test of section 654 does not apply. [Citations.] . . . [S]hould a defendant use a weapon in the commission of a nonsex offense which immediately succeeds a sex offense in which there has been no weapon use, the weapon use does not also attach to the sex offense because the latter is completed and a new offense has begun. [Citation.]" (*People* v. *Funtanilla, supra*, 1 Cal.App.4th at pp. 331-332.)

No other Court of Appeal has reached the same conclusion as *Funtanilla*. In *People* v. *Jackson* (1980) 110 Cal.App.3d 560 [167 Cal.Rptr. 915], the victim was asleep in the front room of a massage parlor "when she was awakened because a towel had been placed over her face . . . . She saw defendant standing over her holding an 18-inch pair of scissors . . . ." (*Id.* at p. 564.) She struggled with him and, "[i]n an effort to stall," suggested they go into another room. (*Ibid.*) There, the defendant "undressed the victim and forced her to perform oral copulation. After a brief conversation,

defendant then" raped the victim. (*Ibid.*) During the acts of oral copulation and rape, "the scissors were in defendant's pants which were lying on the floor . . . ." (*Id.* at p. 568.) The Court of Appeal upheld the jury's finding under section 12022(b) that defendant had used a deadly weapon (the scissors) in the commission of the two crimes. (*People* v. *Jackson, supra,* 110 Cal.App.3d at pp. 564, 569.) The court stated in part: "The victim testified that she awoke to find defendant standing over her and holding the 18-inch scissors and that she complied with defendant's demands because she was afraid for her safety *and continued to be afraid.*" (*Id.* at p. 569, italics added.)

In *People* v. *Turner* (1983) 145 Cal.App.3d 658 [193 Cal.Rptr. 614], as the victim opened her car door, defendant Turner brandished a gun and shoved her inside. (*Id.* at p. 668.) "Telling her he was a good shot, he walked around the front of the car, tucked the gun into the front of his pants, and entered on the passenger side . . . ." (*Ibid.*) He placed the gun between the seats and told the victim she would not be harmed if she cooperated. They drove to a secluded spot where Turner forced her to remove her pants and to perform oral copulation. He then orally copulated, raped, and robbed her. (*Ibid.*) He was convicted of rape, two counts of oral copulation, kidnapping, and robbery. The jury also found that he had used a gun in the commission of each crime. (*Id.* at p. 667.)

On appeal, Turner contended that the trial court should have instructed sua sponte on being armed with a deadly weapon and firearm because the allegations under sections 12022.3(a) and 12022.5 that he personally used a firearm necessarily included the arming enhancements as well. (*People* v. *Turner, supra,* 145 Cal.App.3d at p. 683.) The Court of Appeal disagreed, finding on the facts before it "no possibility Turner was simply armed with a gun but did not personally use it in the commission of all the offenses of which he was convicted." (*Id.* at p. 684.) The court observed: "The gun Turner used was an essential part of the crimes he committed. He first displayed it in the kidnaping and had it available for use thereafter. Although he placed the gun on the seat between himself and Ms. B., it was never out of his sight and always within his reach. When Ms. B. was forced to disrobe in preparation for the sexual assaults, Turner transferred the gun to a position on the floor where it was out of her way but still accessible to him. The victim described the gun as 'the most frightening thing to me because I just feared the gun more than anything.'" (*Id.* at pp. 684-685.) The court concluded: "Where the victim is sufficiently frightened by the use of a weapon such that it becomes unnecessary to continually display the weapon during the course of later crimes against that victim within a brief span of time, a use finding under section 12022.5 [and section 12022.3(a)] *is proper.*

[Citation.] It would indeed be paradoxical to hold otherwise and reward with reduced punishment the criminal who *effectively* uses a firearm." (*Id.* at p. 685, italics added.)

In *People* v. *Camacho* (1993) 19 Cal.App.4th 1737 [24 Cal.Rptr.2d 286], a limousine driver opened the door of her vehicle and found defendant Mortis pointing a gun at her. He ordered her into the car. She slid across the seat and opened the other door to escape, but defendant Camacho was there pointing a gun at her. The two men drove the victim to a residential area, where they raped and robbed her. (*Id.* at p. 1741.) Separate juries convicted Camacho and Mortis of kidnapping for robbery, forcible rape in concert, attempted forcible oral copulation in concert, and second degree robbery, and found true firearm use allegations accompanying each count. (*Id.* at p. 1740.) On appeal, the defendants contended that there was insufficient evidence of firearm use in commission of the sex offenses. (*People* v. *Camacho, supra,* 19 Cal.App.4th at p. 1747.) The court disagreed, concluding: "[Defendants], like the defendant in *Turner,* 'sufficiently frightened' [the victim] by displaying their guns and threatening to kill her. It was unnecessary thereafter 'to continually display' their guns. As [the victim] testified, 'Well, I didn't really want to push them, because I knew there were guns. And I did not want to fight, because they told me if I fought them, or if I looked at them, they were going to kill me.'" (*Ibid.*) The court distinguished *People* v. *Funtanilla, supra,* 1 Cal.App.4th 326, by noting that defendants Mortis and Camacho "never left the limousine during the sexual assaults, and the victim reasonably believed they had instant access to their firearms." (*People* v. *Camacho, supra,* 19 Cal.App.4th at p. 1748.)

*Funtanilla* in turn distinguished *People* v. *Turner, supra,* 145 Cal.App.3d 658, and *People* v. *Blevins* (1984) 158 Cal.App.3d 64 [204 Cal.Rptr. 124],[6] stating that in "both of them, the defendant never absented himself from the victim's presence between commission of the several offenses, and the weapon was at all times within his reach and, inferentially, within the victim's sight. Furthermore, the victim in *Turner* testified specifically concerning her fear of the gun. [¶] . . . To satisfy [section 12022.3(a)] there must be actual use during the offense at issue. Here, once the initial rape of [the victim] was completed, i.e., once all the elements of section 261 had occurred and [the defendant] left the room, any attendant firearm use was also completed. In order for a weapon use enhancement to attach to the later sex offenses, the People had to present evidence that [the defendant] again

---

[6]In *People* v. *Blevins, supra,* 158 Cal.App.3d 64, the defendant apparently conceded he "used the knife in connection with" each sex offense. (*Id.* at p. 68.) Thus, while the opinion does not indicate that the defendant displayed the knife to the victim or threatened her with it more than once, the court did not analyze this issue.

used a weapon when he reentered the bedroom and committed the subsequent offenses. In the absence of any evidence that a gun was even present, let alone used, during the subsequent offenses . . . , the gun use enhancements imposed therefor cannot stand." (*People* v. *Funtanilla, supra,* 1 Cal.App.4th at p. 333.)

Defendant contends, "*Funtanilla* controls here." In particular, he asserts that, because he left the kitchen on several occasions before raping and sodomizing Mary, and was in the apartment for more than an hour before committing these sex crimes, a finding that he used a gun in the commission of the rape and sodomy was impermissible absent evidence that he again displayed the gun immediately before committing the sex crimes.

We disagree. In considering whether a gun use occurred, the jury may consider a "video" of the entire encounter; it is not limited to a "snapshot" of the moments immediately preceding a sex offense. Thus, a jury could reasonably conclude that although defendant's presence with the victims was sporadic, the control and fear created by his initial firearm display continued throughout the encounter.

Here, defendant tied up Mary and Marietta immediately after his initial gun display. Having thereby incapacitated his victims, defendant was free to commit whatever crimes he desired at his leisure and in any location. Thus, neither the fact that defendant left the room on numerous occasions, nor that he spent an hour robbing and torturing Mary and her mother before raping and sodomizing Mary, had any bearing on her continuing state of helplessness engendered directly by the gun use. Given the control that defendant's initial gun display effected, use findings under section 12022.3(a) were permissible even if he did not "continually display the weapon during the course of later crimes." (*People* v. *Turner, supra,* 145 Cal.App.3d at p. 685.) Under these circumstances, the jury could reasonably conclude that defendant, by his initial display, "utilized the gun at least as an aid in completing an essential element of" the crimes of rape and sodomy, i.e., that he accomplished these acts against Mary's will "by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury" on the victim or another person. (*People* v. *Chambers, supra,* 7 Cal.3d at pp. 672-673; §§ 261, subd. (a)(2), 286, subd. (c).) Thus, the evidence is sufficient to support a finding under section 12022.3(a) that defendant used a firearm in committing these offenses.

In addition, a jury could also conclude that the fear defendant's initial gun display instilled continued throughout the encounter and aided defendant in completing an essential element of the crimes of rape and sodomy. (§§ 261,

subd. (a)(2), 286, subd. (c).) Defendant asserts, however, that, "[u]nlike *Turner* or *Blevins*, there was neither any testimony that Mary . . . feared the gun nor was there evidence from which she could have concluded that the gun was still present or within [defendant's] reach." The prosecution need not, however, elicit testimony from the victim that she feared or maintained an actual awareness of the gun during the commission of each and every crime defendant committed after the initial weapon display. Rather, a jury could reasonably infer that defendant retained the firearm after using it to coerce Mary into the kitchen. Moreover, Mary's statement to her mother, "Just do whatever he says to do, because he has a gun," and her testimony that she directed defendant to various locations of the house to search for money and jewelry in the hope that "he wouldn't kill [them]," reflect a fear and coercion from the gun display that a jury could reasonably conclude continued throughout the subsequent sex crimes. Contrary to defendant's assertion, permitting a jury to draw this logical inference does not impermissibly shift the burden of proof.

Citing *Funtanilla,* defendant also argues: "[T]heft counts are 'continuing' in nature: that is, they are not complete unless and until the perpetrator reaches a point of temporary safety. [Citation.] Thus, a firearm display which occurs during the commission of one theft count will 'carry over' to all of the others which are committed between the display of the firearm and the point where the perpetrator reaches the place of temporary safety. [Citation.] However, sex offenses are of limited duration. They typically begin with each new penetration and end when that penetration ends. Because they are not 'continuing' offenses, a single firearm display committed in connection with one offense will not 'carry over' to a subsequent offense unless there is some substantial evidence that the firearm was actually used in the commission of that offense." As additional support, defendant cites *People* v. *Fierro, supra,* 1 Cal.4th at pages 226-227, where we held that a firearm use enhancement applied to a defendant who committed robbery and used a gun to facilitate his escape or prevent his identification as the robber, but not during the actual taking or against the robbery victim. Defendant also cites *People* v. *Dobson* (1988) 205 Cal.App.3d 496, 499-503 [252 Cal.Rptr. 423], which held that deadly weapon use enhancements did not attach to the defendant's sex crimes because he completed those offenses before using a weapon in an attempt to kill his victim. (Cf. *People* v. *Castro* (1994) 27 Cal.App.4th 578, 582-586 [32 Cal.Rptr.2d 529] [disagreeing with *Dobson*].)

We reject this contention. ■ A firearm use enhancement attaches to an offense, regardless of its nature, if the firearm use aids the defendant in completing one of its essential elements. (See *People* v. *Chambers, supra,* 7

Cal.3d at pp. 672-673.) As the Court of Appeal observed, under defendant's interpretation, section 12022.3(a) would apply to a rape conviction only if a defendant displayed the firearm simultaneously with penetration. (See also *People* v. *Heston* (1991) 1 Cal.App.4th 471, 480 [2 Cal.Rptr.2d 26] [gun furnished before act of robbery occurred furnished "during the commission . . . of a felony" within the meaning of § 12022.4].)

Moreover, *People* v. *Fierro, supra,* 1 Cal.4th 173, and *People* v. *Dobson, supra,* 205 Cal.App.3d 496, address a different factual scenario than that before us. Here, the gun display occurred *before* the sex crimes, not after. The jury could reasonably conclude that this menacing display assisted defendant in later completing an element of the crimes of rape and sodomy. Thus, we need not determine whether a section 12022.3(a) enhancement properly attaches when a defendant first displays a gun *after* completing a sex crime, for example, in an effort to assist his escape or deter the victim from reporting the crime.

Defendant further asserts that ". . . logic permits *either* the imposition of separate sentences for the underlying sex offenses, *or* separate enhancements on each count, but not both. . . . If California law has narrowly defined the duration of sex offenses in order to avoid Penal Code section 654's prohibition upon multiple punishments and permit lengthier sentences for the commission of such offenses, it cannot logically turn around and broadly construe the duration of the same offenses in order to also impose sentence enhancements." However, we hold only that the jury may find true a gun use allegation when it concludes a defendant "utilized the gun at least as an aid in completing an essential element of" a subsequent crime. (*People* v. *Chambers, supra,* 7 Cal.3d at pp. 672-673.) Moreover, contrary to defendant's implication, and language in *People* v. *Funtanilla, supra,* 1 Cal.App.4th at page 331, we have never held that section 654 applies to weapon enhancements. (*People* v. *Coronado* (1995) 12 Cal.4th 145, 156-157 [48 Cal.Rptr.2d 77, 906 P.2d 1232]; *People* v. *King* (1993) 5 Cal.4th 59, 78 [19 Cal.Rptr.2d 233, 851 P.2d 27].) We need not and do not reach that issue in this case either.[7]

Finally, defendant asserts that the Court of Appeal's conclusion conflicts with the purpose of the weapon enhancement statutes " 'to deter the use of

---

[7]To the extent defendant is arguing there was insufficient evidence to support the section 12022.3(a) gun use enhancements for the two sex crimes because of the "noncontinuing" nature of those crimes, the assumptions underlying this argument are flawed. In *People* v. *Harrison, supra,* 48 Cal.3d 321, we indeed held that a sex offense is "complete" as soon as nonconsensual penetration occurs. (*Id.* at pp. 328-329.) Such language, however, described the conduct minimally necessary to trigger a statutory violation and warrant conviction. As *People* v. *Harrison* also explained, however, the circumstances under which a defendant can be *convicted* of a sex offense are statutorily and analytically distinct from any *sentencing* considerations. (*Id.* at pp. 332-333.) Defendant and *People* v. *Funtanilla, supra,* 1 Cal.App.4th

firearms in the commission of violent crimes by prescribing additional punishment for each use.' [Citations.]" (*People* v. *Fierro*, *supra*, 1 Cal.4th at pp. 225-226.) In particular, defendant argues that ". . . if a single display of a firearm at the commencement of a three-hour period during which the defendant committed a number of sex and theft offenses would be sufficient to impose sentence enhancements in connection with each and every count, there would then be nothing to discourage the defendant from brandishing the firearm throughout the entire three-hour period, with the obvious danger that the firearm could discharge and wound or kill one of the defendant's victims. In short, the Court [of Appeal's] position would effectively remove from the statute the entire deterrent effect which the Legislature intended it to have."

We believe these fears are unfounded. Defendant fails to recognize that attaching an enhancement to each crime an initial firearm display facilitates may discourage a defendant from using a firearm at all. Thus, our conclusion furthers section 12022.3(a)'s legislative objective " 'to deter the use of firearms in the commission of violent crimes by prescribing additional punishment for each use.' [Citations.]" (*People* v. *Fierro*, *supra*, 1 Cal.4th at pp. 225-226.) Defendant's interpretation, by contrast, weakens the section's deterrent effect by greatly reducing the consequences of a defendant's initial firearm use.

CONCLUSION

We conclude the jury could have reasonably found that defendant utilized his initial display of the gun "at least as an aid in completing an essential element of" the subsequent crimes of rape and sodomy. (*People* v. *Chambers*, *supra*, 7 Cal.3d at pp. 672-673; §§ 261, subd. (a)(2), 286, subd. (c).) Accordingly, the evidence was sufficient to support imposition of section 12022.3(a) enhancements for those crimes. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., and Brown, J., concurred.

MOSK, J.—I dissent. The record reveals that no substantial evidence supports the verdict finding true the weapons-use enhancements for the sex crimes.

---

at page 331, are thus incorrect insofar as they suggest the ban on multiple punishment in section 654 has any bearing on whether a sex offense occurred, or that the reasoning of *Harrison* is relevant to determining the circumstances under which a defendant is deemed to have used a firearm for purposes of enhancing his sentence under section 12022.3(a). For these reasons, we disapprove *People* v. *Funtanilla*, *supra*, 1 Cal.App.4th 326, insofar as it is inconsistent with this opinion.

At the time of the crimes—April 2, 1991—Penal Code section 12022.3, subdivision (a), required an enhancement for certain sex crimes "if the person uses a firearm or any other deadly weapon in the commission of the violation." (Stats. 1989, ch. 1167, § 3, p. 4529.) " 'Use' means, among other things, 'to carry out a purpose or action by means of,' to 'make instrumental to an end or process,' and to 'apply to advantage.' " (*People* v. *Chambers* (1972) 7 Cal.3d 666, 672 [102 Cal.Rptr. 776, 498 P.2d 1024].) A firearm-use enhancement may be imposed when the assailant "produces a fear of harm or force by means or display of a firearm in aiding *the commission of* one of the specified felonies." (*Ibid.*, italics added.)

Multiple sex offenses may be completed seriatim during a single course of conduct. Each is discrete. The effect of this rule is to *increase* punishment. "Assuming other elements of the offense are present, a statutory violation is generally complete as soon as the requisite 'penetration,' 'touching,' or contact occurs. We have explained the underlying rationale as follows: 'As [Penal Code] section 263 notes with regard to the sufficiency of "penetration" in rape cases, the "essential guilt" of sex offenses lies in the "outrage" to the person and feelings of the victim . . . .[] The "slight penetration" language confirms that this peculiar "outrage" is deemed to occur each time the victim endures a new, unconsented sexual insertion. The Legislature, by devising a distinctly harsh sentencing scheme, has emphasized the seriousness with which society views each separate unconsented sexual act, even when all are committed on a single occasion.' " (*People* v. *Scott* (1994) 9 Cal.4th 331, 341 [36 Cal.Rptr.2d 627, 885 P.2d 1040]; see also *People* v. *Jones* (1993) 5 Cal.4th 1142, 1145 [22 Cal.Rptr.2d 753, 857 P.2d 1163] [defendant sodomized victim three times and inserted finger in rectum once during an hour-long ordeal and initially was sentenced to thirty-two years' imprisonment under the "harsh regime of subdivisions (c) or (d) of [Penal Code] section 667.6"].)

But because each such offense is discrete, there must be substantial evidence that defendant used a gun for each. I doubt that a weapon must be brandished each time; under *Chambers* it need only be " 'appl[ied] to advantage.' " (7 Cal.3d at p. 672.) Even by that standard, however, there was no gun use during the sex crimes, which occurred essentially at the end of events.

It seems that the crime spree lasted from two hours to two hours and forty-five minutes. At a minimum, it took more than an hour. Initially, defendant displayed a gun to the younger victim in order to rob. She never saw it again. She testified that she feared its presence when she told her mother, the second victim, to comply with defendant's orders, but later

began to wonder whether it might be broken and thought he might knife them. By that time defendant, having confined both victims to the kitchen, had roamed around the house repeatedly, making perhaps more than 20 excursions to find valuables. Then he came back, committed rape and sodomy against the daughter, and departed soon afterward.

Shying away from the discrete nature of sex offenses, the majority hold that "the jury may consider a 'video' of the entire encounter; it is not limited to a 'snapshot' of the moments immediately preceding a sex offense." (Maj. opn., *ante*, at p. 1011.) This statement generates colorful rhetoric but only the vaguest legal rule. We can imagine how perplexed jurors would be if the court instructed them according to that concept.

"Because the proceeding on the enhancement, although not intrinsic to the question of guilt or innocence, had the ' "hallmarks of a trial on guilt or innocence" ' . . . the state was required to prove the enhancement allegations beyond a reasonable doubt . . . ." (*People* v. *Santamaria* (1994) 8 Cal.4th 903, 939 [35 Cal.Rptr.2d 624, 884 P.2d 81] (appen. to conc. and dis. opn. of Mosk, J.) quoting opn. of Werdegar, J., in the Court of Appeal therein.) This burden the prosecution did not meet. The victims never testified that the gun was used at the time of the sex crimes. There is no evidence that the gun was even present when the daughter was sexually assaulted—defendant could have placed it in a car or otherwise disposed of it. The majority declare that "a jury could reasonably infer that defendant retained the firearm after using it to coerce Mary [the victim of the sex crimes]" (maj. opn., *ante*, at p. 1012), but it could only do so if presented with evidence that would justify such an inference, otherwise the assumption unconstitutionally shifts the burden of proof to defendant. The trial testimony reveals no evidence from which a jury could draw that inference. I would strike the two 4-year enhancements imposed under former Penal Code section 12022.3, subdivision (a).