89 Cal.Rptr.2d 75 (1999)
75 Cal.App.4th 150
The PEOPLE, Plaintiff and Respondent,
v.
Billy Jack BELCHER, Defendant and Appellant.
No. F027501.
Court of Appeal, Fifth District.
September 24, 1999.
Review Granted November 23, 1999.
*77 Geri Lynn Green, under appointment by the Court of Appeal, San Francisco, for Defendant and Appellant.
Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Harry Joseph Colombo and W. Scott Thorpe, Deputy Attorneys General, for Plaintiff and Respondent.
Certified for Partial Publication.[*]

OPINION
VARTABEDIAN, Acting P.J.
The "One Strike Law," found in Penal Code section 667.61, requires an indeterminate life term when a defendant commits certain forcible sexual crimes in combination with enumerated factors.[1] Here, a jury found defendant Billy Jack Belcher guilty of two counts of forcible rape *78 (counts I and II) and one count of forcible oral copulation (count III). The jury also found he engaged in tying or binding of the victim in the commission of all three offenses within the meaning of section 667.61, subdivision (e)(6). The trial court sentenced defendant to consecutive life terms for counts I and III; the same term for count II was stayed. The terms require that defendant is not eligible for parole for 15 years. The published portion of this opinion concerns the "tying or binding" allegations and the availability of consecutive and/or life sentences. We remand the case to the trial court to resentence defendant on counts II and III. In all other respects we affirm.

FACTS
Debbie D. and Robert Combs had been friends for 20 years; each had a drug problem. Debbie and Combs made a date to go out on May 2, 1996. Combs arrived at Debbie's house, accompanied by his friend, John Johnson.
Sabrina Phelps and her husband, Santiago Chavira, arrived at Debbie's house to baby-sit her children. Debbie, Combs, and Johnson left.
Combs, Debbie, and Johnson went drinking at El Presidente bar. In addition, Combs and Debbie used methamphetamine. The three then went to the Pump House and continued drinking. Debbie got into a verbal altercation with a man at this bar; Combs, Debbie, and Johnson then went to the Green Olive. Defendant was at the Green Olive when they arrived. Debbie recognized defendant because they attended high school at the same time. Combs recognized defendant from prior drug dealings. Defendant paid a lot of attention to Debbie. Combs left, by himself, for about an hour to return some clothes to a friend. When Combs returned, he was upset because his vehicle had sustained a flat tire. Defendant and Johnson helped Combs fix the flat tire. Combs, Johnson, and defendant agreed to go to another bar. Combs and Debbie argued, and Debbie got into defendant's van. Defendant sped off. Combs and Johnson were unable to locate Debbie or defendant.
Defendant drove to a canal and parked. Debbie and defendant snorted a line of methamphetamine. They sat and talked for quite some time. There were cars in the area, so defendant moved his van off the road. Defendant mixed Debbie a drink. She snorted another line of methamphetamine. After taking two sips of the drink, Debbie fell asleep.
When Debbie awakened she found her wrists were in her lap, tied together loosely with a red bandanna. Defendant was squatting behind her playing with her hair. Debbie asked defendant why she had the bandanna on her wrists. He replied that she told him she wanted it on there. Defendant also told Debbie that he had placed socks on her feet because they were cold. Debbie pulled off the bandanna and put it on the dashboard. She thought defendant was acting weirdly, and she told him she wanted to go home. Defendant wanted to wait until the sun came up. Debbie said no.
Defendant tried to start the car, apparently without success. Defendant said the battery must be dead. Debbie got in the driver's seat, and defendant handed her a key; the key would not fit into the ignition. Until this point, defendant had been "calm, nice." Defendant's demeanor changed. He pulled Debbie from the van onto the ground. Defendant was on top of Debbie. She started screaming, and defendant told her to shut up. Defendant told Debbie to be quiet because "he had to do what he had to do."
Defendant tied Debbie's wrists behind her back. Debbie's wrists were tied tighter *79 than when Debbie awoke to find her wrists tied together. Defendant picked Debbie up and told her to get in the van, told her to calm down, and said he was not going to hurt her.
Debbie continued to cry. Defendant then tied her hands tighter with something that felt like rubber. Debbie said, "Billy, don't." Defendant calmed down and started acting nice again. Defendant told Debbie, "You understand why I have to do this," and explained that his wife had treated him badly. Debbie was afraid defendant would hurt her or kill her, so she decided she would not physically resist defendant's aggressions.
Defendant took the bindings off Debbie's wrists and began undressing himself. He touched Debbie's breasts, kissed her, and removed her pants. While Debbie was sitting on the seat of the car facing defendant, he engaged in an act of oral copulation. This act lasted 30 seconds to 1 minute. Defendant then raped Debbie for one to two minutes while he was facing her and she was on the seat. He removed his penis, turned Debbie around so she was facing away from him, and raped her again. He removed his penis and ejaculated on her buttocks. Defendant cleaned Debbie's buttocks with a cloth.
Defendant got dressed and handed Debbie her pants. She got dressed also. Debbie was crying. Defendant asked Debbie how much money she needed for the baby-sitter. Debbie refused the money. Defendant threw something out the window and drove off. Defendant said he could not drive any farther into town and he let Debbie out of the car.
At approximately 5:30 a.m., from a pay telephone, Debbie called Phelps, who along with Chavira was still at Debbie's home. She asked for a car ride home. Debbie was crying during the call. Chavira picked up Debbie; he observed she was scared and crying. He took her home. When Debbie arrived home, Sabrina asked her what had happened. Debbie said defendant had raped her. Sabrina told Debbie to call the police. Debbie did not want to call the police because she had used drugs that evening; she feared the authorities would take her children from her. Sabrina called the police.
Sheriff Deputy Jerry Mayberry arrived at Debbie's home. She was visibly upset and crying. Debbie went with the police to show them where the attack occurred and then she was taken to the hospital. At the scene, detectives found black electrical tape with red fibers and defendant's fingerprints on it, shoeprints that matched defendant's shoes, a key to defendant's house, and an empty foil packet labeled Sominex.
Debbie was examined by a sexual assault nurse. Debbie had a black adhesive substance on her left wrist and an abrasion over her eye. Debbie was tearful but did not appear to be under the influence. An internal examination revealed an "acute mounting injury" consistent with a forceful event. A blood sample taken from Debbie showed that she had methamphetamine and alcohol in her system.
Defendant was interviewed. In his first interview, defendant said he talked to Debbie at the Green Olive. He helped Combs fix a flat tire then he left by himself and went home. Defendant told the officers he had not consumed drugs for four years. Defendant denied leaving with Debbie and/or having sex with her. Defendant was shown the key found at the rape scene. He denied recognizing it, and claimed his wife kept all the keys to their house. Defendant then said Debbie put his shirt on and the key must have been in the pocket. Defendant later said he left with Debbie, Combs and Johnson and took some methamphetamine. Defendant curtailed the interview. He was arrested and then agreed to give a statement. Defendant then stated that he and Debbie had consensual sex. He lied about their encounter initially because he did not want his wife to find out. Defendant claimed *80 the electrical tape was at the scene because Combs used it for his stereo.

Defense
Defendant testified at trial that he was at the Green Olive when Debbie came in with Combs and Johnson. Combs told defendant he knew a good methamphetamine supplier. Defendant said he was interested in making a $400 purchase. Defendant did not intend to buy methamphetamine at that time; he was just shopping and hoping to get a sample without paying. Combs left and returned. Combs, Debbie, and Johnson left in Combs's car. Combs told defendant to follow them, and he did. They went to the canal, where defendant purchased $20 worth of methamphetamine. While at the canal, defendant gave Combs electrical tape to fix his stereo. Johnson and Combs left, to get some alcohol, but they did not return.
Debbie and defendant talked, drank, and used methamphetamine. Debbie and defendant "made out." Debbie mentioned where they could get some methamphetamine and told defendant she could show him a good time if he bought her a $40 bag of methamphetamine. They got in the back seat of the van. Defendant asked if Debbie wanted to play games. Defendant got out the electrical tape. Debbie giggled and held out her wrists. Defendant put tape around Debbie's wrists. They engaged in an act of oral copulation, followed by an act of sexual intercourse. Debbie was anxious to get more drugs. Defendant told Debbie he did not have any money. Debbie was irate. Defendant lied to the detectives during the initial interviews because he was scared, he was on probation, and he was concerned about his wife.
Dr. Arthur Molina testified that Debbie's injuries could have been as a result of childbirth two months prior, or there could have been bleeding from a low grade infection.
Pat Hurt, a licensed clinical social worker, testified that someone on methamphetamine might have wild mood swings. A user of methamphetamine and alcohol could suffer from delusional thoughts, paranoia, irritability, and irrational anger.

DISCUSSION

I.-II.[**]

III.

Sufficiency of Evidence: Application of Section 667.61 When the Victim Is Not Restrained During the Sexual Acts
Under section 667.61, a person convicted of certain forcible sex crimes, including rape and oral copulation, under one of the circumstances listed under subdivision (e) of this section, is punished by a prison term of life without parole eligibility for 15 years. (§ 667.61, subd. (b).) Subdivision (e) lists seven such circumstances. The sixth listed circumstance is: "The defendant engaged in the tying or binding of the victim or another person in the commission of the present offense." (§ 667.61, subd. (e)(6).)
Here, defendant tied and/or taped Debbie's wrists and then released her from the bindings before he engaged in the sex acts. Defendant claims there is insufficient evidence to support the finding that he engaged in the tying or binding of Debbie in the commission of the three sex offenses. Defendant asserts that there was no evidence Debbie was restrained during the sex acts, the ties were not displayed to her during the sex acts, and she was not threatened with the ties during the acts. Thus, because Debbie was not tied during the acts and there was not a continued threat of Debbie's being tied again, defendant claims there was insufficient evidence that he engaged in the act of tying and binding in the commission of the offenses.
*81 We know of no published cases that discuss the factual basis required to prove the tying and binding occurred in the commission of the sexual offense. Nevertheless, the term "in the commission of or a similar phrase is found in many other statutes and has been interpreted in case law. "Where a statute is framed in language of an earlier enactment on the same or an analogous subject, and that enactment has been judicially construed, the Legislature is presumed to have adopted that construction. [Citations.]" (People v. Harrison (1989) 48 Cal.3d 321, 329, 256 Cal.Rptr. 401, 768 P.2d 1078.) The term "in the commission of has been given broad application. (See People v. Chambers (1972) 7 Cal.3d 666, 102 Cal.Rptr. 776, 498 P.2d 1024.)
The case of People v. Masbruch (1996) 13 Cal.4th 1001, 55 Cal.Rptr.2d 760, 920 P.2d 705 provides appropriate guidance for the construction of the term "in the commission of as found in section 667.61, subdivision (e)(6). In Masbruch, the defendant came to the door of Mary's apartment to apply for a vacant apartment. After entering the apartment, the defendant pointed a gun at Mary. He had Mary lie on the floor in the kitchen where he hogtied her. Mary's mother, Marietta, came downstairs. Mary told her to do what defendant said because he had a gun. The defendant tied Marietta to a chair. Next, the defendant searched the apartment for money and valuables, receiving directions from the victims. The defendant proceeded to shock Mary and Marietta with spliced electrical cords before raping and sodomizing Mary. Mary saw the defendant going through the butcher knife drawer; she thought maybe defendant's gun was broken and he was now going to slit their throats. The defendant left and Mary called the police. Except for the initial display of the gun, Mary did not see the gun again during the encounter. (13 Cal.4th at pp. 1004-1005, 55 Cal.Rptr.2d 760, 920 P.2d 705.)
The defendant was convicted of numerous crimes and it was found he used a firearm "in the commission of the rape (§ 12022.3, subd. (a)). (Masbruch, supra, 13 Cal.4th at p. 1005, 55 Cal.Rptr.2d 760, 920 P.2d 705.) On appeal, the defendant claimed "he did not `use' the gun `in the commission of the sex offenses because he displayed it only at the outset of his criminal activity, approximately one hour before he committed the sex offenses, and he left Mary several times during the interim to commit crimes in other parts of the house." (Id. at 1006, 55 Cal.Rptr.2d 760, 920 P.2d 705.) The Supreme Court disagreed.
First, the Supreme Court stated whether a gun was used in the commission of an offense is a question of fact for the jury. (Masbruch, supra, 13 Cal.4th at p. 1007, 55 Cal.Rptr.2d 760, 920 P.2d 705.)
"In considering whether a gun use occurred, the jury may consider a `video' of the entire encounter; it is not limited to a `snapshot' of the moments immediately preceding a sex offense. Thus, a jury could reasonably conclude that although defendant's presence with the victims was sporadic, the control and fear created by his initial firearm display continued throughout the encounter." (Id, at p. 1011, 55 Cal.Rptr.2d 760, 920 P.2d 705.)
Although the defendant displayed the gun only at the beginning of his encounter, Mary was in a continuous state of helplessness engendered directly by the initial gun display. The defendant's display put him in control, and the jury could reasonably conclude that the gun was utilized as an aid in completing the sex offenses. (Masbruch, supra, 13 Cal.4th at p. 1011, 55 Cal.Rptr.2d 760, 920 P.2d 705.)
Defendant here claims that when the facts of this case are contrasted with the facts in Masbruch, it is clear that the tying and binding allegation was not proven.
Contrary to defendant's assertion, the facts here amply support the tying and *82 binding allegation. Defendant bound Debbie's hands on two occasions. The second time he did so, he first threw her to the ground and told her he had to do what he had to do. Defendant untied Debbie and within five minutes sexually assaulted her. Debbie testified she complied because she was afraid of defendant and thought he was going to further harm her.
Bindings do not have the same lethal potential as a gun. Yet, like the use of a gun in the commission of an offense, the tying and binding of Debbie reasonably could lead the jury to conclude the acts instilled fear that continued throughout the encounter. By tying and binding Debbie, defendant created for himself a position of power and dominance over Debbie. The tying and binding caused fear in Debbie and, as stated in her testimony, she felt intimidated to not resist the sexual acts. Debbie's continuing state of helplessness resulted directly and in substantial measure from the tying and binding activities. Substantial evidence supports the tying and binding allegations.

IV.

Constitutionality: Tying or Binding "in the Commission of the Present Offense"
Prior to trial, defendant made a motion to set aside the allegations that he tied the victim for vagueness of the phrase "in the commission of the present offense." The judge hearing that motion granted it and stated:
"If you untie somebody proximately and then have a discussion with them and then have sex with them, that's sufficient time, so that the special allegation of tyingit's not similar to a gun. If somebody pulls a gun out and then puts it away, the rapistthe rapee still is concerned about the fact that the raper has a gun in his pocket.
"I don't think that same thing is applicable with tape. But the facts would be different if you took the tape off and, you know, hung it right there for her to see and intimidate her with the tape."
The People filed a motion to reconsider. The judge reversed his earlier ruling and reinstated the tying and binding allegations, stating:
"We don't know whether or not the facts of this case are the kind that particularly fall within the intention of the legislature. There's been no case to answer that question in these facts.
"I believe it's the intent of the legislature that it should encompass these, even though there was the one time."
Relying on the judge's expressed confusion, defendant claims that the words of section 667.61, subdivision (e)(6), that the defendant engaged in tying or binding of the victim or another person in the commission of the present offense, are vague and ambiguous. Although defendant's focus in the trial court was on the phrase "in the commission of," here he shifts focus to "engaged in."
"No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the state commands or forbids." (Lanzetta v. New Jersey (1939) 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888.) Due process of law is violated when those of common intelligence must guess at the meaning of a statute which might forbid the doing of an act. (People ex rel. Gallo v. Acuna (1997) 14 Cal.4th 1090, 1115, 60 Cal.Rptr.2d 277, 929 P.2d 596.) Further, in order to prevent arbitrary and discriminatory application of a law, the law is also void for vagueness if it fails to provide standards for those who must enforce it, i.e., law enforcement, judges and juries. (Id. at p. 1116, 60 Cal.Rptr.2d 277, 929 P.2d 596.) Nevertheless, "a claim that a law is unconstitutionally vague can succeed only where the litigant demonstrates, not that it affects a substantial number of others, but that the law is vague as to her or `impermissibly *83 vague in all of its applications.'" (Ibid.)
Defendant claims that cases determining whether a defendant "used" a firearm during the commission of an offense are not applicable to cases involving the tying and binding allegation because the tying and binding allegation requires that the defendant "engaged in" tying and binding as compared to "used" tying and binding.
Defendant acknowledges that "use," in the firearm context, is given a broad meaning. (People v. Masbruch, supra, 13 Cal.4th at p. 1007, 55 Cal.Rptr.2d 760, 920 P.2d 705.) "Although the use of a firearm connotes something more than a bare potential for use, there need not be conduct which actually produces harm but only conduct which produces a fear of harm or force by means or display of a firearm in aiding the commission of one of the specified felonies." (People v. Chambers, supra, 7 Cal.3d at p. 672, 102 Cal.Rptr. 776, 498 P.2d 1024.) But, defendant argues that "`engaged in,'" by definition, requires more than simply a display or threat of restraints to a victim. It implies the actual physical act of tying the victim in the commission of the offense. A tie is not engaged when it is displayed to the potential victim, to enforce a demand as `use' of a firearm may be." Therefore, defendant claims the broad definition of use cannot be utilized to eliminate vagueness with the term "engaged in."
The flaw in defendant's argument is that he is mixing two requirements into one. This fault is demonstrated by the analysis in People v. Masbruch, supra, 13 Cal.4th at page 1001, 55 Cal.Rptr.2d 760, 920 P.2d 705. In Masbruch, the Supreme Court first established what was necessary to constitute a "use" and then determined whether that use was "in the commission of the offense. Here it must be determined first if defendant "engaged" in the tying and binding of the victim. Then it is determined if these actions occurred "in the commission of the sex offense.
There is no question here that defendant engaged in the tying or binding of the victim. Defendant has failed to show that the term "engaged" as applied to the facts here is unconstitutionally vague. Nor would "engaged" present an arguable uncertainty in any case in which bindings were actually applied to the body of the victim. Accordingly, defendant has not established that "engaged" is unconstitutionally vague. (People ex rel. Gallo v. Acuna, supra, 14 Cal.4th at p. 1116, 60 Cal. Rptr.2d 277, 929 P.2d 596.) Defendant has not argued on appeal nor in any way shown that the term "in the commission of is vague.
Although the pretrial hearing judge indicated confusion as to the precise meaning to be given this subdivision, the initial ruling was made prior to hearing the facts. The facts clearly demonstrated that as applied to defendant the subdivision is not vague: the prosecution alleged defendant actually bound the victim. After hearing the facts at sentencing, the trial court found the tying and binding allegation to be appropriate and valid.
Defendant also argues that the statute is vague as applied to him because Debbie was not bound during the sexual acts. Defendant claims that in accordance with the legislative history, the type of tying or binding which the statute seeks to punish is the tying or restraining of a sexual assault victim in an effort to stop her from fighting back or resisting during the sex acts. Defendant claims the statute requires continued restraints or at the very least an unveiled threat of further restraint, because each causes the victim to be particularly vulnerable.[2]
The express language of section 667.61, subdivision (e)(6) defeats the argument. Section 667.61, subdivision (e)(6) applies if *84 a defendant tied the victim or another person in the commission of the offense. Thus, the restraints need not be placed on the victim. It is clear that the purpose of the allegation is not directed solely at controlling the actions of the victim during the assault by physical means, because it can apply when no physical bindings are placed on the victim at all; they are placed on another.
It is apparent that the Legislature intended in section 667.61, subdivision (e)(6) to further punish a sexual offender who has rendered his victim particularly vulnerable by a particular means, namely, tying or binding the victim (who might otherwise flee or fight back) or someone else (who might otherwise run for help, intervene in the assault, or otherwise make the crime more difficult to commit). Far from creating an unconstitutional vagueness when compared with this legislative intent, the words of the statute clearly implement the intent. In particular, the requirement that the tying or binding occur "in the commission of the offense makes it clear that the Legislature, applying the well-established case law interpreting that phrase, intended to include tying and binding of the victim, tying and binding of another, and the express or implied threat of renewed binding within the sweep of subdivision (e)(6).

V.[***]

VI.

Consecutive and/or Life Sentences
At sentencing, the trial court sentenced defendant to 15 years to life for count I (rape).[3] On count II (rape) the court sentenced defendant to a term of 15 years to life. This sentence was stayed pursuant to section 654. The court then found that count III (oral copulation) was a separate and distinct act and sentenced defendant to 15 years to life to run consecutively to count I.[4] The district attorney asked the court to clarify why it found count III to be separate and distinct. The court stated:
"THE COURT: It's a separate and distinct sexual act, number one. There was sufficient time between the other acts and sufficient time for reflection to make it a separate and distinct act. I think that should be sufficient."
Defendant claims it was error for the court to sentence him to consecutive terms when the offenses all occurred against the same victim, on a single occasion, without reasonable opportunity to reflect. Defendant also asserts the court failed to state adequate reasons for its sentence choices, the probation report erroneously described the incident, and his trial counsel failed to argue the applicable law which resulted in an illegal sentence.
Section 667.61, subdivision (g) provides:
"(g) The term specified in subdivision (a) or (b) shall be imposed on the defendant once for any offense or offenses committed against a single victim during a single occasion. If there are multiple victims during a single occasion, the term specified in subdivision (a) or (b) shall be imposed on the defendant once for each separate victim. Terms for other offenses committed during a single occasion shall be imposed as authorized under any other law, including Section 667.6, if applicable."
Defendant relies on People v. Murphy (1998) 65 Cal.App.4th 35, 76 Cal.Rptr.2d 130 to support his position that he may be sentenced only to one life term under section 667.61, subdivision (g) because the *85 offenses here were committed on one occasion.
In People v. Murphy, supra, 65 Cal. App.4th 35, 76 Cal.Rptr.2d 130, the defendant was convicted of one count of forcible oral copulation against Kristy and three counts of forcible oral copulation, two counts of forcible rape, and one count of genital penetration against Carma. The crimes against the two victims occurred on "separate occasions." (Id. at p. 38, 76 Cal.Rptr.2d 130.) The trial court found section 667.61 to be ambiguous and utilizing this ambiguity and section 654 the trial court imposed a life sentence for the count involving Kristy, stayed sentence for the oral copulation against Carma, and imposed consecutive midterm sentences on the remaining counts. The only applicable circumstance under section 667.61 to elevate the sex crimes to the life terms was that the defendant was convicted in the same proceeding of a violent sex offense against multiple victims. The People appealed, claiming that two life sentences were authorized because the defendant committed violent sex offenses against different victims on different occasions. The People also argued section 654 was not violated. The defendant argued:
"[T]he trial court cannot impose two 15-to-life terms based on section 667.61, subdivision (e)(5)the multiple victim circumstancebecause to do so would violate section 654. He contends two life sentences constitute double punishment for the `same act' i.e., the act of committing a violent sex offense against two different victims. In other words, each sex offense is punished by life imprisonment because of the other." (People v. Murphy, supra, 65 Cal.App.4th at p. 41, 76 Cal.Rptr.2d 130.)
The appellate court rejected the defendant's argument, finding that "multiple violent sex offenses deserve more punishment than a single violent sex offense because of the predatory nature of the perpetrator." (Ibid.) The appellate court also stated that: "The only limitation on the number of life sentences which can be imposed is contained in section 667.61 subdivision (g), which provides that the defendant shall be sentenced to one life term per victim per occasion no matter how many offenses listed in subdivision (c) the defendant committed against a particular victim on a particular occasion." (Id. at p. 40, 76 Cal.Rptr.2d 130.)
Although the above quoted statement in Murphy that "the defendant shall be sentenced to one life term per victim per occasion no matter how many offenses listed in subdivision (c) the defendant committed against a particular victim on a particular occasion" was dicta, applying well established rules of statutory construction we find it to be correct.
We begin with a comparison of section 667.61 with other statutes using similar language.
"Statutes are not to be read in isolation, but must be construed with related statutes. [Citation.] When legislation has been judicially construed and a subsequent statute on a similar subject uses identical or substantially similar language, the usual presumption is that the Legislature intended the same construction, unless a contrary intent clearly appears. [Citations.]" (In re Jerry R. (1994) 29 Cal.App.4th 1432, 1437, 35 Cal.Rptr.2d 155.)
Section 667.6, subdivision (d) requires imposition of a full, separate, and consecutive term for certain sex crimes involving "the same victim on separate occasions." The statute was amended to provide guidelines for determining whether the crimes occurred on separate occasions. "In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior." (Ibid.) Section 667.6, subdivision (d), as *86 amended to reflect the guidelines for separate occasions, was in effect at the time section 667.61 was enacted.
Although an argument could be made that the term "single occasion" utilized in section 667.61, subdivision (g) should be given the same meaning attributed to the term "separate occasion" contained in section 667.6, subdivision (d) (because they utilize similar language and pertain to similar subjects), on closer analysis we find that the two terms were not meant to have the same construction.
In People v. Deloza (1998) 18 Cal.4th 585, 76 Cal.Rptr.2d 255, 957 P.2d 945, the Supreme Court was called upon to determine the meaning of the term "same occasion" as that term is used in the three strikes law, section 667 and 1170.12. The Supreme Court stated:
"[T]he legislative and initiative versions of the three strikes law are the only Penal Code sections that use the term `same occasion.' Nothing in either the language of subdivision (a)(6) and (7) or its legislative history suggests the electorate intended these words to have a special or peculiar import different from their ordinary, generally understood meaning. The phrase `committed on the same occasion' is commonly understood to refer to at least a close temporal and spatial proximity between two events, although it may involve other factors as well. Making mandatory consecutive sentences for those current crimes committed on different occasions is consistent with the focus of the three strikes law, which is recidivism. (Ballot Pamp., text of Prop. 184, Gen. Elec. (Nov. 8, 1994) p. 64 [The voters' stated intent in enacting section 1170.12 was `to ensure longer prison sentences and greater punishment for those who commit a felony and have been previously convicted of serious and/or violent felony offenses.']; § 667, subd. (b); People v. Newsome [(1997) 57 Cal.App.4th 902, 913, 67 Cal.Rptr.2d 438].)" (People v. Deloza, supra, 18 Cal.4th at pp. 594-595, 76 Cal.Rptr.2d 255, 957 P.2d 945.)
Although "single occasion" (§ 667.61), "separate occasion" (§ 667.6), and "same occasion" (§ 667) appear to have substantially similar meanings to a layperson, the language is not identical. Furthermore, it is only in section 667.6, subdivision (d) that the Legislature saw fit to give "separate occasions" a definition different from the ordinary, generally understood meaning. Section 667.61 did not utilize substantially similar language as that used in section 667.6, subdivision (d) because it omitted completely the specific qualifications listed separately in section 667.6, subdivision (d).
The Legislature directly referenced section 667.6 when it enacted section 667.61, yet it chose to utilize different language in the two sections and chose to omit the additional guidelines contained in section 667.6. These two differences in the statutes indicate to us that the terms "single occasion" and "separate occasion" were intended to have different meanings.
To give the term "single occasion" its commonly understood meaning (as set forth in Deloza) would not lead to absurd results. The spirit of section 667.61 is to impose a substantial sentence against a defendant convicted of a specified sex offense committed under certain enumerated, aggravated conditions. The imposition of a life term certainly accomplishes this purpose.
Another indication that the court may only impose one life sentence per victim per single occasion is found in the portion of section 667.61, subdivision (g), which states: "Terms for other offenses committed during a single occasion shall be imposed as authorized under any other law, including Section 667.6, if applicable." The word "terms" must only refer to "terms" that would qualify under section 667.61. It is overwhelmingly clear that terms for other crimes (i.e., crimes, sexual or otherwise that do not satisfy section 667.61) may always be sentenced under the *87 applicable laws. To make such a statement in section 667.61 would be wholly unnecessary. Thus, its meaning must be that terms which qualify under section 667.61 but occur during a single occasion with the same victim must be sentenced under other sections, including section 667.6. If "single occasion" in section 667.61 is interpreted to be synonymous with "separate occasion" in section 667.6, subdivision (d), then all remaining section 667.61 terms (those terms which occurred against a single victim on a single occasion) would only qualify for sentencing under section 667.6, subdivision (c). Yet, the Legislature did not limit its reference in section 667.61, subdivision (g) to section 667.6, subdivision (c) only.
Further support for the conclusion that a section 667.61 life sentence may be imposed only once per occasion is found by reviewing the term "once" as utilized in subdivision (g).
"The objective of statutory interpretation is to ascertain and effectuate legislative intent. To accomplish that objective, courts must look first to the words of the statute, giving effect to their plain meaning. If those words are clear, we may not alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history. [Citation.] Whenever possible, we must give effect to every word in a statute and avoid a construction making a statutory term surplusage or meaningless. [Citations.]" (In re Jerry R., supra, 29 Cal.App.4th at p. 1437, 35 Cal. Rptr.2d 155.)
To interpret that a defendant is vulnerable under this statute to more than one life term for acts against a single victim on a single occasion renders meaningless the use of the term once as is evident by striking the twice-used term from the statutory language: "The term specified in subdivision (a) or (b) shall be imposed on the defendant once for any offense or offenses committed against a single victim during a single occasion. If there are multiple victims during a single occasion, the term specified in subdivision (a) or (b) shall be imposed on the defendant once for each separate victim. Terms for other offenses committed during a single occasion shall be imposed as authorized under any other law, including Section 667.6, if applicable."
We find section 667.61's use of the term "single occasion" should be given its ordinary, commonly understood meaning, and defendant could be sentenced to only one life term under section 667.61. The trial court erred when it imposed and stayed a life sentence for count II and imposed a consecutive life sentence for count III.
The appellate court in Murphy discussed what sentence, if any, should be imposed on the remaining sexual offenses not subject to a life term. The People argued: "[T]he reference in the last sentence of section 667.61, subdivision (g) to `other offenses' includes any leftover violent sex offenses against the victim after one offense is punished by an indeterminate life term. These leftover offenses, the People maintain, should be punished as they normally would be if there were no one strike law." (People v. Murphy, supra, 65 Cal.App.4th at p. 42, 76 Cal. Rptr.2d 130.) The court accepted this argument, finding that "the Legislature intended the defendant should be punished for every violent sex offense against the victim, not just the first one." (Ibid.) In reaching this conclusion, the appellate court noted "it would be a highly unusual sentencing scheme which imposed the same punishment on a defendant for one violent sex offense as for six." (Id. at p. 43, 76 Cal.Rptr.2d 130.)
Here, the sentence on the remaining two offenses are to be imposed pursuant to the relevant code violations (i.e., § 261, subd. (a)(2), forcible rape; and § 288, subd. (a)(2), forcible oral copulation). The court must choose between the mitigated, aggravated or middle term. Next, the court must decide if the sentences should be *88 fully consecutive to the count I life sentence under the provisions of section 667.6, subdivision (c) or (d). In making this decision, the trial court should be guided by this court's opinion in People v. Irvin (1996) 43 Cal.App.4th 1063, 51 Cal.Rptr.2d 127. If the trial court determines that one or both of the convictions involved separate occasions, as that term is defined under section 667.6, subdivision (d) and case law, then the sentence or sentences must be fully consecutive. If the court determines that one or both convictions are not "separate occasions," then the court must exercise its discretion and determine if one or both should be imposed under section 667.6, subdivision (c). If the court imposes a discretionary full consecutive term pursuant to section 667.6, subdivision (c), then the case of People v. Hicks (1993) 6 Cal.4th 784, 25 Cal.Rptr.2d 469, 863 P.2d 714 clearly establishes that section 654 is not applicable to that sentence.
The sentence on count I was mandatory and is affirmed. On resentencing the court must determine the appropriate sentences for counts II and III. Because the case must be remanded for resentencing on counts II and III, it is not necessary to determine if the probation officer's report erroneously described the events giving a false presentation on the question of separateness, nor is it necessary to determine if counsel was ineffective in not arguing available sentencing alternatives.

VII.[]

DISPOSITION
The case is remanded for resentencing on counts II and III. In all other respects, the judgment is affirmed.
HARRIS, J., and LEVY, J., concur.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I, II, V, and VII of the discussion.
[1] All future code references are to the Penal Code unless otherwise noted.
[**] See footnote *, ante.
[2] Defendant has requested that we take judicial notice of the legislative history of this code section. We grant that request. We have reviewed the legislative history and find no elucidation.
[***] See footnote *, ante.
[3] The district attorney chose the first rape in time (the face-to-face rape) as count I.
[4] We note that the language of section 667.61, subdivision (b) differs somewhat from the court's statement that defendant is sentenced to a term of 15 years to life. Subdivision (b) provides that the term is "imprisonment in the state prison for life and [defendant] shall not be eligible for parole for 15 years."
[] See footnote *, ante.