Filed 2/21/14  P. v. Garrett CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D062969 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD235343) |
| WILLIAM ALLEN GARRETT, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Gale E. Kaneshiro, Judge.  Affirmed as modified with directions.

Russell S. Babcock, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Sean M. Rodriquez, Deputy Attorneys General, for Plaintiff and Respondent.

William Garrett appeals from a judgment convicting him of burglary, with a deadly or dangerous weapon use finding, and receiving stolen property.  He argues (1)

there is insufficient evidence to support the weapon use finding, and (2) the trial court erroneously admitted statements he made to a detective and a deputy sheriff that were obtained in violation of *Miranda*[1] principles. We find no reversible error.

The Attorney General concedes defendant was improperly sentenced for a prior serious felony conviction and a prior prison term based on the same 1990 felony conviction. Accordingly, we modify the judgment to strike the one-year prior prison term based on this prior conviction, which reduces defendant's sentence from 16 years to 15 years. As so modified, the judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

At about 10:00 p.m. on July 14, 2011, an employee working late on the third floor of an office building heard a loud pounding noise and then glass breaking. The employee called 911.

When the police arrived, they set up a perimeter around the building. Officers Andres Ruiz and Brandon Jordan took the elevator to the second floor. When they stepped out of the elevator into a courtyard lined by office suites, Officer Ruiz announced that they were police officers, and the officers scanned the darkened area with the lights attached to their guns. The officers saw that a tree planter had been used to break the glass window panel next to the door for one of the office suites. As Officer Ruiz made a radio call to notify other officers of the broken window, Officer Jordan shined his light inside the office suite. Officer Jordan saw defendant inside the suite running towards the

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436.

2

broken window. The officers yelled at defendant to stop and get on the ground, but he did not comply.

Officer Ruiz noticed that defendant had a black object (which turned out to be a camera) in his left hand and a knife in his right hand. As defendant exited the office, defendant was hunched over so he could clear the glass that was still attached to the window panel. He was moving "pretty fast," holding the black object like a "running back" with a football, and holding the knife at about "mid-level" with his arm at a 90-degree angle.

When defendant cleared the glass, he was running in a basically upright position towards the officers, perhaps leaning slightly forwards, with the knife in his hand. Officer Ruiz feared for his and Officer Jordan's safety, thinking defendant was running at them in an effort to get away; that defendant was going "to fight his way out of there" and stab one of them as he fled the scene; and it appeared "almost as if [defendant] was squaring off" with them.[2] Officer Jordan was unable to see the knife as his view of defendant was partially blocked by the tree planter that was in the broken window. However, Officer Jordan testified that defendant was running "straight at" them; defendant appeared to be "about to over run" them; and Officer Jordan was preparing to tackle him. Officer Jordan also feared for his and Officer Ruiz's safety because "it appeared that a confrontation was about to go down."

---

[2]    Officer Ruiz testified he thought the only way for defendant to leave the building was to go by the officers to the elevator, but he later learned defendant could have avoided the officers by exiting through a stairwell. However, Officer Ruiz did not perceive defendant as running towards this stairwell.

When defendant was several feet from the officers, Officer Ruiz fired three rounds from his gun, striking defendant on his neck behind his ear and on his forearm. Defendant fell to the ground and Officer Ruiz kicked away the knife that was lying next to defendant's hand.

An employee of the burglarized office suite testified that the office had been "rifled through"; things were in disarray; and items were missing, including a computer tower and a camera. When inspecting the courtyard outside the suite, the authorities found the camera and a backpack worn by defendant which contained the computer tower.

*Defendant's Post-arrest Statements about the Offense*

On July 18 (four days after the offense), Detective Brett Burkett obtained a *Miranda* waiver from defendant and conducted a recorded interview with him at the hospital. When asked to describe "what happened that night," defendant told the detective that he was repeatedly being arrested "for nothing" and assaulted; he "got tired"; and he thought he "might as well be dead or in jail or locked up." He went into the building with the intention of doing something (like setting a fire or breaking glass) that would bring the police; he saw a "white guy" enter the building and heard the glass break; he scared the man away and went into the office through the broken window; and he waited for an hour for the police to come because he wanted them to kill him. When told there were fingerprints on the planter used to break the window, defendant said he picked up the planter but he did not break the window. He acknowledged the backpack belonged to him, and said he put a camera (but not a hard drive) in it.

4

Defendant said that when he saw the officers, he started running and he "just got cut off"; he was not sure if he was running away from the officers or at them; he thought he was running away from them; but maybe he was running at them because he "wanted to die anyway." When asked if it was true, as claimed by the officer, that he ran at them with a knife in his hand, defendant responded, "Probably. I found a knife in there. . . . [Y]eah I probably had it in my hand. . . . But I was trying to run away from the damn dude. He had a dog. . . ." When told that the officer who shot him thought his life was in danger when defendant ran at him with a knife, defendant said, "well he probably could have assumed that . . . he probably would have thought of it. But I don't see how . . . I'm like . . . 200 pounds less tha[n] this dude." Defendant said he did not surrender to the police because he did not want to go back to jail and he was tired of life and wanted to die; and if the police had not shot at him he would not have tried to hurt them because he was not "in to hurting people." He acknowledged the police would shoot him if he "[g]rab[bed] a knife" because they would feel threatened.

Defendant made similar statements to two officers who were guarding him at the hospital and to a therapist who conducted a psychiatric assessment at the request of the hospital. On July 19, while being guarded by Officer Joseph Pardue, defendant made a spontaneous comment, saying, " 'I snapped. I went up there to have officers shoot me.' " That same day, defendant told therapist Janice O'Sullivan that he tried to kill himself by trying to get the police to shoot him, and he did this by breaking into an office, smoking marijuana while waiting for the police, and then waving a knife around to get the police to shoot him. About one week later, on July 27, another officer who was guarding

5

defendant (Deputy Sheriff Jeffrey Germain) observed defendant's injuries and asked what happened. Defendant responded that "he was trying to commit suicide by cop"; he broke into a business and smoked marijuana; he waited for the police to arrive and then "ran at them with a knife until they shot him."

*Jury Verdict and Sentence*

Defendant was charged with assault with a deadly weapon on an officer (two counts), burglary, and receiving stolen property. The jury acquitted him of the assault counts, and found him guilty of burglary and receiving stolen property. The jury also found that he personally used a deadly or dangerous weapon for the burglary count.

Based on the current convictions, plus four prior prison terms, a serious felony prior conviction, and a strike prior conviction, defendant was sentenced to 16 years in prison.

DISCUSSION

I. *Sufficiency of the Evidence of Weapon Use During Burglary*

Defendant contends the record does not support the finding that he used the knife during the burglary.

The enhancement for personal use of a deadly or dangerous weapon applies when the defendant "personally uses a deadly or dangerous weapon in the commission of a felony or attempted felony . . . ." (Pen. Code, § 12022, subd. (b)(1).) Weapon use requires something more than merely being armed or the bare potential for use. (*People v. Masbruch* (1996) 13 Cal.4th 1001, 1007.) The relevant inquiry is whether the defendant engaged in weapons-related *conduct* with the intent to facilitate the crime.

6

(*People v. Granado* (1996) 49 Cal.App.4th 317, 325, 329.)  If the defendant engaged in "no weapons-related conduct, or such conduct was incidental and unrelated to the offense, no 'use' occurred . . . ."  (*Id.* at p. 325, fn. 7.)

However, the defendant need not engage in conduct that actually produces harm; it is sufficient if the defendant uses the weapon to aid in the commission of the crime by creating *fear* of harm or force.  (*People v. Masbruch, supra*, 13 Cal.4th at p. 1007; *People v. Wims* (1995) 10 Cal.4th 293, 302 [weapon use established if defendant intentionally displays weapon in a menacing manner].)  "[W]hen a defendant deliberately shows a [weapon], or otherwise makes its presence known, and there is no evidence to suggest any purpose other than intimidating the victim (or others) so as to successfully complete the underlying offense, the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure."  (*People v. Granado, supra*, 49 Cal.App.4th at p. 325 [defendant need not actually point gun or issue explicit threats to support use enhancement].)

A defendant can properly be found to have used a deadly weapon in the commission of the offense when the weapon is used during the defendant's *flight* from the crime scene.  (*People v. Fierro* (1991) 1 Cal.4th 173, 225-227; *People v. Taylor* (1995) 32 Cal.App.4th 578, 580-583 [enhancement applied to firearm use during escape from burglary, even though elements of burglary are complete upon entry]; *People v. Granado, supra*, 49 Cal.App.4th at p. 329; see *People v. Alvarado* (2001) 87 Cal.App.4th 178, 185, 187-191; *People v. Frausto* (2009) 180 Cal.App.4th 890, 902-903.)  The only mental state requirement for the use enhancement is the *defendant's intent* to use the weapon in

7

furtherance of the crime, and a use finding can be supported even if a victim was unaware of the weapon. (*People v. Granado, supra*, 49 Cal.App.4th at pp. 326-329.)

In reviewing a challenge to the sufficiency of the evidence, we examine the entire record in the light most favorable to the judgment to determine whether there is substantial evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Nelson* (2011) 51 Cal.4th 198, 210.) We presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*Ibid.*) If the circumstances reasonably justify the jury's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. (*Ibid.*)

Defendant asserts he did not display the knife in a menacing manner in an effort to thwart the police and facilitate his escape, but rather he only incidentally held it in his hand while running away from the police. The jury was not required to reach this conclusion.

According to the police officers who found defendant in the office suite, defendant was running directly at them while holding the knife in his hand. Officer Ruiz (who saw the knife) thought defendant was going to fight with them in order to escape; Officer Jordan (who did not see the knife) thought defendant was going to collide with them; and defendant's conduct caused both officers to fear for their safety. Given the overall aggressive nature of defendant's conduct, the jury could reasonably conclude that he displayed the knife in a menacing manner to discourage attempts to apprehend him and to facilitate his flight from the scene of the burglary.

8

Defendant contends the forensic evidence presented at trial refuted the officers' testimony that defendant was running directly at them, and instead showed that he was running away from them. Contrary to defendant's claim, the forensic evidence was not definitive on this issue. For example, the doctor who conducted a forensic examination indicated that defendant's wounds could be consistent with different directions of travel, depending on such factors as how defendant was standing, whether he changed positions after the first shot was fired, and the movements of the shooter. Further, the doctor explained that the medical evidence alone was not conclusive as to what occurred and other information, including witness statements, was needed.

Moreover, even if defendant was running away from the officers, the jury could reasonably conclude that he was displaying the knife with the intent to instill fear and impede attempts to stop him as he fled the scene of the burglary. Regardless of which direction defendant was running, the record supports that he was acting in an aggressive manner and was not merely holding the knife in a benign manner as he tried to leave the scene.

Defendant's contention that the weapon use finding cannot be supported by facts relevant to the assault charges of which he was acquitted is unavailing. First, the jury's finding that he used a deadly weapon is not necessarily inconsistent with the jury's finding that he did not assault the officers. The jury could have concluded that he displayed the knife to instill fear so no one would try to stop him as he attempted to escape (thus establishing weapon use during the burglary), but that the facts did not otherwise establish assaultive conduct directed at the officers.

9

Second, even if the verdicts are inconsistent, when evaluating a challenge to the sufficiency of the evidence, "each count must stand on its own, and a verdict on one has no bearing on any other." (*People v. Pahl* (1991) 226 Cal.App.3d 1651, 1657.) This principle is premised on the recognition that an inconsistent acquittal may be the product of mistake, compromise, or leniency, and the defendant should not be permitted to take further advantage of the result. (*Id.* at pp. 1656-1657; *People v. Lewis* (2001) 25 Cal.4th 610, 656.) " 'Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt. . . . This review should be independent of the jury's determination that evidence on another count was insufficient.' " (*People v. Palmer* (2001) 24 Cal.4th 856, 863.) Thus, the weapon use finding can properly be based on the assaultive nature of defendant's conduct even though defendant was acquitted of the assault charges.

To support his challenge to the jury's weapon use finding, defendant cites such evidentiary items as Officer Ruiz's testimony that defendant was not waving the knife over his head, and the fact that Officer Jordan (who was standing closer to defendant than Officer Ruiz) did not see the knife. Although these were relevant factors for the jury to consider, they do not defeat the evidentiary support for the weapon use finding.

## II. *Claims of* Miranda *Error*

### A. *Admission of Defendant's Statements to Detective Burkett*

Defendant asserts the court erred in denying his motion to suppress the recorded statements he made to Detective Burkett at the hospital because he did not knowingly and intelligently waive his *Miranda* rights.

### *Background*

At an Evidence Code section 402 (section 402) hearing addressing the *Miranda* issue with respect to Detective Burkett, Burkett testified that on the morning of July 18 (four days after the shooting) he interviewed defendant at the hospital for about 15 minutes. Defendant was attached to "various items of medical intervention" such as I.V. tubes. Defendant did not complain about being in pain or show signs of pain, but Detective Burkett thought his situation "looked painful" because he had a tube near his neck and it took him "some time to answer." Detective Burkett said to defendant, " 'I know you're on medication, but you know where you are, right?' " Defendant made no complaints about being on medication, and they continued to talk. An officer who accompanied Detective Burkett asked defendant if he could identify the clothing the officer was wearing, and defendant stated the officer was wearing a blue shirt and red tie.

When Detective Burkett provided the *Miranda* advisements and asked if defendant understood them, defendant responded, " 'Yes, sir.' " When Detective Burkett asked if defendant wished to speak with him, defendant responded, " 'Might as well. It don't matter.' "

11

Detective Burkett testified that painkillers tend to have a calming effect, and defendant did not appear to be under the influence of a controlled substance. During the interview, defendant appeared to comprehend what Detective Burkett was saying, and their interaction was "like a regular conversation." Defendant answered responsively to questions about what he was doing at the location, and about his actions and motivations. Defendant told the detective that a " 'a white guy' " broke into the place, and he came "after the white guy . . . ." Detective Burkett told defendant there was a witness at the scene and the witness never saw another man there; defendant asked what the witness had seen; and Detective Burkett responded the witness heard the break-in but did not actually see defendant. Detective Burkett testified that during the interview defendant kept repeating that he wanted to die, but he otherwise mostly stayed on topic.

The trial court denied the suppression motion, stating the detective indicated defendant appeared able to comprehend and to have a conversation; the fact that defendant might have been in pain or taking pain medications did not necessarily show his ability to comprehend was affected; and the totality of the circumstances described by the detective showed defendant "understood what was going on in the conversation in the hospital."

*Analysis*

To protect the Fifth Amendment privilege against self-incrimination, the *Miranda* rule provides that statements made during a custodial interrogation cannot be admitted as evidence of guilt unless the defendant was advised of and waived the rights to remain silent and to counsel, and warned about the adverse use of statements. (*Berghuis v.*

*Thompkins* (2010) 560 U.S. 370, 380, 382.)  To establish a valid *Miranda* waiver, the prosecution must show by a preponderance of the evidence that the defendant *understood* the *Miranda* advisals.  (*Id.* at p. 384.)  If the *Miranda* warnings were provided, the court may examine "the whole course of questioning" to determine whether the defendant provided a knowing waiver.  (*Id.* at p. 388.)  On appeal from a denial of a *Miranda* challenge, we defer to the trial court's factual findings if supported by substantial evidence, and independently review whether there was a valid *Miranda* waiver.  (*People v. Williams* (2013) 56 Cal.4th 165, 184.)

Defendant contends his waiver at the hospital was not knowing and intelligent because he was likely being treated with narcotic painkillers; he had recently attempted suicide and had a history of mental illness; and during the interview he was disoriented, responded inappropriately to questioning, and digressed from the topic.

The fact that a defendant may be mentally ill, in pain, or using controlled substances during a police interview does not alone compel a conclusion that the defendant was unable to make a knowing and intelligent *Miranda* waiver.  (*People v. Whitson* (1998) 17 Cal.4th 229, 249; *People v. Breaux* (1991) 1 Cal.4th 281, 299-301; *People v. Kelly* (1990) 51 Cal.3d 931, 951; *People v. Watson* (1977) 75 Cal.App.3d 384, 397.)  Although these are relevant factors to consider, the totality of the circumstances must be examined.  (*Kelly, supra*, at p. 950; *Watson, supra*, at p. 396.)

Here, defendant answered affirmatively when Detective Burkett asked if he understood his *Miranda* rights, and Detective Burkett perceived defendant's statements during the interview as responsive and comprehensible.  Detective Burkett described

13

various statements made by defendant that reflected defendant was engaging in a rational interaction, including defendant's description of an officer's clothing, his explanation as to how he entered the building, and his query regarding the observations of the witness at the crime scene. This showing suffices to establish that defendant provided a knowing and intelligent waiver of his *Miranda* rights. The record does not suggest that defendant's mental or medical condition interfered with his ability to understand what Detective Burkett was saying to him, including regarding the *Miranda* advisements.

Also, we have reviewed the transcript of the recorded interview and conclude that it corroborates Detective Burkett's claim that defendant was rational during the interview.[3] Contrary to defendant's claim, the transcript does not reflect that he was disoriented during the interview. Although defendant at one point digressed slightly from the immediate question posed by the detective, the verbal exchanges between defendant and the detective are understandable and logical. Reflective of defendant's ability to comprehend, during the interview defendant presented his claims to the officers in coherent fashion, including that he was not the person who broke the window; he had no intention of hurting the officers but wanted them to hurt him; the fact that he was shot in his side showed he was running away from the officers; his criminal history showed he

---

[3]     It is not clear from the record whether the trial court was presented with the transcript of the recorded interview for purposes of the section 402 hearing. As asserted by the Attorney General, we generally confine our review to matters presented to the trial court at the time of its ruling. However, defendant has requested that we review the transcript, and we exercise our discretion to do so. (See *People v. Kelly, supra*, 51 Cal.3d at p. 951.)

14

committed property crimes but he did not hurt people; and he believed the authorities treated him unfairly.

Defendant further asserts that his response when asked if he wanted to speak (" 'Might as well.  It don't matter.' ") reflects that he did not understand the consequences of waiving his *Miranda* rights.  We are not persuaded.  Standing alone, there is nothing in defendant's expression of resignation that suggests he was confused or could not understand what the detective was telling him.  To support his claim of lack of comprehension, defendant also cites the commencement of the interview when the detective said to defendant "I know you're on medication but do you know where you're at?" and the transcript of the interview denotes defendant's response as "unintelligible." This small portion of the interview does not show defendant was unable to understand what was being said to him.  Immediately after this, defendant responded to the officers' queries by saying that he could see them and by describing what an officer was wearing. This reflected his awareness and understanding of the officers' communications.

The trial court did not err in finding that defendant made a knowing and intelligent *Miranda* waiver.[4]

B.  *Admission of Defendant's Statements to Deputy Germain*

Defendant argues his statements to Deputy Germain at the hospital were inadmissible because Germain interrogated him without providing *Miranda* warnings.

---

[4]     Given our holding, we need not discuss the Attorney General's contention that defendant cannot challenge the trial court's ruling based on his history of mental illness because this matter was not presented to the trial court at the section 402 hearing.

15

*Background*

Deputy Germain guarded defendant at the hospital after his arraignment and appointment of counsel. At a section 402 hearing addressing the admissibility of defendant's statements to Deputy Germain, Germain testified that when he first contacted defendant, he had received booking information about defendant's general charges and a briefing from the previous guard about such matters as whether defendant had been "acting up or not" and whether he was chained. When Deputy Germain saw defendant's injuries, he asked defendant what happened, without providing the *Miranda* advisals. Deputy Germain explained, "And then I saw his injuries, and I asked him about his injuries. [¶] . . . [¶] . . . I asked him what happened, basically, because we're together in a room for 12-and-a-half hours and I want an idea for my own safety the extent of his injuries and what they were. I asked him what happened, and he responded."[5] Defendant told Deputy Germain that he was trying to commit "suicide by cop" by breaking into a business, smoking marijuana and waiting for the police, and then running at them with a knife until they shot him.

Deputy Germain testified that he was not trying to elicit incriminating information from defendant, but rather his "purpose was making general conversation because we were stuck in a room together and for my own safety, to get an idea of why he was in there." To continue making general conversation, Deputy Germain asked defendant why he wanted to commit suicide, and defendant answered that he "just got tired of living."

---

[5] When questioned on cross-examination, Deputy Germain testified he did not know if he used the exact phrase " 'what happened' " when he queried defendant.

16

Deputy Germain also talked with defendant about such matters as defendant's complaints about items that were missing from the meals he was being provided.

The trial court ruled that Deputy Germain's questions did not constitute interrogation, and thus rejected the defense claim that the statements were inadmissible due to the absence of *Miranda* advisements.

*Analysis*

*Miranda* advisements are required when a defendant is subjected to a custodial interrogation. (*People v. Andreasen* (2013) 214 Cal.App.4th 70, 86.) Interrogation refers not only to express questioning, but also to its functional equivalent; i.e., " ' "any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect." ' " (*Ibid.*) However, not all police questioning of a person in custody constitutes interrogation. (*Ibid.*) The exclusion of communications " ' "normally attendant to arrest and custody" ' " recognizes that the police may properly engage in routine functions that are *distinct from investigatory functions* without giving rise to the *Miranda* requirements. (*Ibid.*, italics omitted; *People v. Williams, supra*, 56 Cal.4th at pp. 186-188 [questions that are "part of a routine, noninvestigative prison process" are not subject to *Miranda* rules].) For example, a *Miranda* interrogation does not typically occur when the police ask questions related to safety concerns or engage in casual conversations unrelated to the offense. (*People v. Andreasen, supra*, 214 Cal.App.4th at p. 87; *Commonwealth of Pennsylvania v. Abdul-Salaam* (Pa. 1996) 678 A.2d 342, 351 ["small talk concerning Appellant's family and injury was merely general conversation,

17

which is routinely attendant with a custodial relationship" and "did not rise to the level of an interrogation"].)

The fact that information gathered from these routine questions or casual conversations turns out to be incriminating does not alone render the statements inadmissible. (*People v. Andreasen, supra*, 214 Cal.App.4th at p. 87.) However, an interrogation may emerge during routine or casual exchanges if the police ask questions " ' "that are designed to elicit incriminatory admissions." ' " (*People v. Williams, supra*, 56 Cal.4th at p. 187; *Andreasen, supra*, at p. 88.) The courts caution that the facts of any routine questioning or casual conversation must be carefully scrutinized to ensure that the police are not using the communication as a pretext for eliciting incriminating information. (*Williams, supra*, at p. 187; *Andreasen, supra*, at p. 88.) When evaluating whether the *Miranda* requirements should apply during noninvestigative routine or casual exchanges, relevant factors to consider include the nature of the questions, the context of the questioning, the knowledge and intent of the officer asking the questions, the relationship between the questions and the crime, the administrative need for the questions, and any other indications that the questions were designed to elicit incriminating evidence. (*Williams, supra*, at pp. 187-188; *Andreasen, supra*, at p. 88.)

Defendant argues that Deputy Germain's question to him about what happened constituted interrogation because he essentially asked him "about what caused him to end up in custody."

Preliminarily, we do not find Deputy Germain's question about what happened to fall within the safety-related category of permissible questioning without *Miranda*

18

warnings. Although Deputy Germain may have wanted to acquire more information to determine whether defendant posed a safety risk, the deputy already had general information about defendant's conduct from the booking charges; he could have obtained more information from law enforcement officers; and defendant was in a secure environment.

However, we are satisfied Deputy Germain's question constituted permissible general conversation that does not trigger the *Miranda* requirements. The question about what happened was innocuous and did not specifically ask about what happened in relation to the crime. For example, defendant could have answered the question by simply saying he was shot, without making any reference to the offense that gave rise to the shooting. Moreover, unlike Detective Burkett, Deputy Germain was not conducting an investigation. There was nothing in Deputy Germain's inquiry about what happened that suggested he wanted to know about the crime as opposed to the injuries, or that the question was being used as a pretext to elicit incriminating information. After defendant disclosed what he had done, Deputy Germain did not ask follow up questions about the crime. Considering the totality of the circumstances—including a single question that was made by an officer acting as a guard not an investigator, that made no specific reference to the offense, and that was made upon viewing the defendant's injuries—we conclude Deputy Germain's question constituted general conversation that was permissible to establish rapport and encourage a cooperative attitude during lengthy guarding activity. (*People v. Andreasen, supra*, 214 Cal.App.4th at p. 89.)

19

Alternatively, even assuming arguendo Deputy Germain's question constituted interrogation because it implicitly asked for information about why defendant was in custody, the admission of defendant's statements to the deputy was harmless beyond a reasonable doubt. (*People v. Thomas* (2011) 51 Cal.4th 449, 498.) The erroneous admission of evidence is harmless beyond a reasonable doubt if it was " 'unimportant in relation to everything else the jury considered on the issue in question . . . .' " (*People v. Neal* (2003) 31 Cal.4th 63, 87.) The jury was properly presented with essentially the same statements by defendant in the interviews with Detective Burkett and therapist O'Sullivan, during which he said that he wanted the police to shoot him because he wanted to die, and he ran with a knife in his hand so the police would feel threatened and shoot him.

Further, to the extent defendant's statements to Deputy Germain buttressed the prosecution's theory that he ran *at*, rather than *from*, the officers, this point had significant relevance to the assault charges of which he was acquitted, but not to the burglary and receiving stolen property charges of which he was convicted.[6] Under the prosecution's theory of the case, defendant entered the building with the intent to commit theft, and the nature of defendant's movements while holding the knife had little or no bearing on the theft-related elements of the burglary and receiving stolen property offenses. As to the

---

[6] Deputy Germain's testimony reflects that defendant unequivocally said that he ran at the officers. In contrast, in the recorded interview with Detective Burkett, defendant repeatedly said he thought he was running away from the officers, although at one point he said he was not sure and he may have been running at them. According to therapist O'Sullivan, defendant said he was waving the knife.

20

weapon use finding, there was strong evidentiary support for that finding based on the overall aggressive nature of defendant's conduct, regardless of whether he was running towards or away from the officers. Further, as noted, Detective Burkett's recorded interview and therapist O'Sullivan's testimony provided the jury with multiple statements by defendant showing he was using the knife in an aggressive fashion as he emerged from the office suite.[7]

For the same reasons, to the extent defendant is also raising a *Massiah*[8] claim of reversible error, we reject this contention. Under *Massiah* principles, upon the commencement of criminal proceedings against a defendant (including after arraignment), the police may not interrogate the defendant outside the presence of counsel. (*People v. Viray* (2005) 134 Cal.App.4th 1186, 1194.) A violation of the right to counsel under *Massiah* occurs when " 'a government agent deliberately elicits from a defendant incriminating statements[;] . . . [i.e.,] when the government intentionally creates or knowingly exploits a situation likely to induce the defendant to make incriminating statements without the assistance of counsel, but not when the government obtains such statements through happenstance or luck.' " (*People v. Williams, supra*, 56 Cal.4th at pp. 189.) Deputy Germain's general question about what happened upon viewing defendant's injuries does not reflect a deliberate elicitation of incriminating

---

7    Given our holding, we need not discuss the Attorney General's alternative contention that the *Miranda* waiver provided by defendant to Detective Burkett carried over to Deputy Germain's communications to defendant.

8    *Massiah v. United States* (1964) 377 U.S. 201.

21

statements, and, alternatively, any error was harmless beyond a reasonable doubt. (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1313.)

### III. *Cumulative Effect of Error*

Because we have not found multiple instances of error, defendant's claim that the cumulative effect of the errors requires reversal is unavailing.

### IV. *Erroneous Imposition of Prior Prison Term Enhancement*

Defendant argues that the trial court erroneously used the same 1990 prior robbery conviction to sentence him to both a one-year term for a prior prison term enhancement and a five-year term for a prior serious felony conviction enhancement. The Attorney General concedes this error, and agrees that the one-year prior prison term enhancement based on the 1990 prior conviction must be stricken from the judgment. (*People v. Jones* (1993) 5 Cal.4th 1142, 1153.) We modify the judgment accordingly.

DISPOSITION

The judgment is modified to strike the one-year sentence on the prior prison term enhancement based on the 1990 conviction.  With this change, defendant's total sentence is 15 years.  As so modified, the judgment is affirmed.  The superior court is directed to prepare an amended abstract of judgment reflecting these changes, and to forward a copy to the Department of Corrections and Rehabilitation.

HALLER, J.

WE CONCUR:


NARES, Acting P. J.


McDONALD, J.

23