Filed 5/5/15  P. v. Meza CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOEL OSVALDO JUAREZ MEZA,<br><br>    Defendant and Appellant. | B250645<br><br>(Los Angeles County<br>Super. Ct. No. MA052713) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathleen Blanchard, Judge.  Affirmed.

Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson and Jessica C. Owen, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## SUMMARY

Joel Osvaldo Juarez Meza appeals from a judgment entered after a jury found him guilty of one count of murder (Pen. Code, § 187, subd. (a))[1] and one count of first degree burglary with a person present (§ 459) and found true the special allegation as to both counts that appellant used a deadly and dangerous weapon within the meaning of section 12022, subdivision (b)(1). He was sentenced to a term of 25 years to life in state prison, plus a one year enhancement.

On appeal, he contends that the trial court abused its discretion by failing to conduct a hearing into whether two jurors had prejudged the matter. In addition, he argues that the jury's true finding of the use of a deadly weapon as to the burglary count was not supported by substantial evidence.[2] We disagree with both contentions and affirm.

## FACTS AND PROCEEDINGS BELOW

Defense counsel in opening argument did not dispute that appellant killed his wife, Jacqueline Mendez (Jackie) on May 5, 2011, but disputed his state of mind, arguing that the killing was the result of heat of passion or a sudden quarrel.

## I.     Prosecution Evidence

Appellant and Jackie were married a little over a year before he killed her. Jackie had two children from a prior marriage and she and appellant had a son, B.M. At first, they all lived together in the home of Jackie's parents and her sister, Monica. While living with Jackie's family, appellant was arrested on one occasion after grabbing and shoving Jackie. After appellant "got violent" and pushed Jackie's father at a family party, appellant and Jackie moved out of the family home and moved with the children into an apartment in the City of Palmdale.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Appellant also argued in his opening brief that the assessments imposed against him were incorrect, but in his reply conceded that the assessments were correct.

Appellant became increasingly controlling of Jackie. Jackie told Monica she was visiting their mother less because appellant would not allow her to visit. When Jackie did visit the family, appellant called her on the telephone and told her to go home and Jackie would pack up the children and leave to go home. Jackie could no longer attend family parties and reunions, although she had previously been close to her family. Appellant did not let Jackie go to church. When an uncle that Jackie was close to died, appellant did not want to stay for the full funeral and made Jackie leave with him. Appellant did not allow Jackie to wear skirts or shorts and prevented her from doing so by cutting all of her skirts. Appellant sometimes called Jackie derogatory names and taunted her for being fat, having stretch marks and sometimes drooling when she laughed. Appellant refused to eat store-bought tortillas, instead requiring Jackie to provide homemade tortillas for him. Appellant also wanted fresh food for his meals, including more expensive items such as shrimp so Jackie bought shrimp for appellant even when the family was having financial difficulties and cooked something else for the rest of the family.

According to Monica, appellant drank alcohol and would "get crazy – I don't want to say crazy, but like violent." On one occasion when Jackie told appellant that he had had enough to drink, Monica saw appellant tell Jackie to shut up and grab and push her face.

Appellant was proud of his son B.M. and favored B.M. over Jackie's two older children. According to Monica, appellant called Jackie's son J.A. a crybaby ("chillon") and gay ("eres es mirica") in Spanish, and her daughter K.A. cockroach ("cucaracha") in Spanish. According to a neighbor, appellant treated the children badly and they were scared of him. J.A., who was nine years old at the time of his testimony, said that appellant treated him and K.A. "badly" and had a "bad" relationship with his mother, Jackie, and would hit Jackie.[3]

Jackie separated from appellant in March 2011. Jackie told appellant she was going to visit her mother, but was actually leaving appellant and had packed a single

---

[3] J.A. also stated that Jackie sometimes would hit appellant back to defend herself.

outfit for her and each child.  While staying with her mother, Jackie was happy and starting to get her life together, finding a job at a produce market and attending church again.  Jackie lived with her mother for two weeks until appellant moved out of their apartment and stayed with a friend nearby so that Jackie and the children could move back into the apartment without him.  Appellant would come to the apartment to see B.M., but Jackie did not want appellant to be in the apartment for visits and had appellant pick B.M. up for visits because she did not want appellant, who wanted to get back together, to get "the wrong idea."  A neighbor at the apartment said that after appellant had moved out, appellant told the neighbor that he was mad and wanted to start a problem or fight with some other neighbors because one of them had said that Jackie was beautiful.

Before her murder on May 5, 2011, Jackie was very scared.  Jackie told Monica that appellant was stalking her and acting crazy and showed Monica threatening text messages Jackie had received from appellant, telling Jackie that if she did not take him back, she was "gonna wish that she wasn't born," that he would "rather kill himself than not be with her" and calling Jackie a "puta" or whore.

Jackie talked to a coworker at the produce market about her relationship with appellant, whom the coworker did not know, and often cried while voicing her fears of appellant.  The coworker believed Jackie was becoming increasingly fearful of appellant. Jackie told the coworker she was afraid that appellant would harm the children. According to the coworker, Jackie received text messages from appellant verbally attacking her.

Jackie also told a male friend, whom she had met in an English class approximately three months before her death, that she was afraid of appellant because he was jealous, violent and an alcoholic.  Jackie did not often speak about her relationship with appellant, but when she did she appeared nervous and scared.

Approximately one month before her murder, Jackie told her classmate that appellant kept saying that "the boy" was not his and her voice was upset.  Jackie's sister, Monica, stated that when Jackie and appellant fought, appellant frequently questioned

4

whether B.M. was his son and Jackie would tell appellant that B.M. was his. Not long before her murder, however, Jackie lied and told appellant that B.M. was not his son in the hopes that appellant would stop harassing her. But the day before her murder, Jackie confirmed that B.M. was appellant's son, telling appellant, "Yes, can't you see. He looks exactly like you."

On May 4, 2011, approximately seven and a half hours before her murder, Jackie arrived at her job at 5:00 p.m., crying because earlier in the morning appellant had argued "very strongly" with Jackie. Appellant wanted to get back together but believed Jackie had another relationship. Jackie looked "like she was really scared that day" and told her coworker that her father had "stayed with the children. They are safe."

Sometime between 10:30 p.m. and 11:00 p.m., Jackie and her classmate spoke by phone as she was leaving work and later texted each other. Jackie indicated that appellant had texted her and that she was nervous and afraid. Her classmate offered to go to Jackie's house to offer support and backup and also told Jackie to call the police if appellant was bothering her. Jackie told her classmate not to come over because she did not want anything to happen to him. Jackie texted her classmate that appellant was outside her apartment and wanted her to open the door. Her classmate again told Jackie to call the police.

Texts and call history recovered from Jackie's cell phone show that Jackie attempted unsuccessfully to contact appellant's brother before appellant arrived. Jackie texted with appellant's brother's daughter (appellant's niece), telling the niece that Jackie did not "want to do anything against him, because then I will be the bad one." The niece texted that she had spoken to appellant and he confirmed that he was heading to Jackie's home. The niece then texted twice asking if appellant had left and Jackie responded that he had not both times. The niece then texted Jackie that appellant would not answer her father's (appellant's brother's) calls and that the niece's mother said that Jackie should do "whatever" was necessary. Jackie's phone showed two incomplete calls to 911.

Appellant arrived at Jackie's apartment after midnight on May 5, 2011. In a statement to police, appellant stated that he told Jackie to open the door for him but she

5

would not and appellant got angry and broke the window to enter the apartment. Appellant also stated that he broke the window to enter her apartment because she said she was seeing someone else and because she said that B.M. was not his son. According to appellant in his statement to the police, after he broke the window and entered the apartment, he and Jackie argued and Jackie said she was going to call the police and appellant asked why she would do that and Jackie said she was with someone else, which was when appellant "really got mad" and cut Jackie with a box cutter[4] he used for work that he had in his pocket. Appellant stated that it started as an argument and escalated to both of them pushing each other and then appellant began attacking and stabbing Jackie with the box cutter but he did not remember where he cut her or how many times he stabbed her.

Jackie's oldest son, then-seven-year-old J.A., testified that he awoke at the sound of the window breaking and when he came downstairs saw appellant "grabbing [Jackie] by the hair and he was hitting her up against the wall . . . ." J.A. built himself "a little house of pillows" on the couch so that only his head was poking out. He heard his mother ask appellant not to kill her and saying that they should be together forever. J.A. ran to push appellant, but appellant pushed J.A. to the floor. J.A. hid back in his pillow house and watched as appellant cut his mother's wrist and then her neck.[5] J.A. then saw appellant cut himself, but his wounds were not comparable to Jackie's and J.A. described appellant as falling "falsely" after his injury.

One neighbor was awoken by the sound of breaking glass and then heard a woman screaming "don't hurt me" and "I'll do anything" and a child yelling "don't hurt Mommy." The neighbor heard appellant counting and telling the children to go upstairs. He estimated that three minutes passed from when he got out of bed and looked out the window before "everything went silent."

---

[4] Appellant called the weapon a "knife."

[5] J.A. apparently believed appellant was using shards of glass to make the cuts.

6

Another neighbor heard glass breaking and then three minutes later Jackie and her children screaming and chaos breaking out. She heard a male voice raised in an "argumentative" manner but not screaming like the female voice and the children who were "screaming in a manner of a plea for help, or stop." The neighbor stated that "it didn't sound like [Jackie] was arguing. It sounded like he was arguing at her and she was screaming for her life." The neighbor stated that it started as a verbal argument but escalated in "seconds" and that the male voice was "escalating" and the female voice "was escalating as in a tone of maybe possibly asking him to leave." The neighbor called 911, telling the operator at the end of the call, "She's screaming like she's being killed! Hurry!"

According to another neighbor, she heard someone knocking "rough[ly]" on Jackie's door and telling Jackie to open the door. The neighbor later heard glass breaking but did not see how appellant entered the apartment. The neighbor heard Jackie screaming "leave me alone" and not to hurt her, but did not hear appellant say anything. She could hear a little boy begging appellant "to stop to stop." The neighbor then heard appellant start to count, apparently telling the little boy to go upstairs, and then 10 seconds later there was more screaming from Jackie as she was being killed. Then "all of a sudden everything got real quiet" and a few seconds later the police arrived.

Deputies from the Los Angeles County Sheriff's Department arrived at the apartment while blood was "still pouring" out of a large cut to Jacqueline's neck that went from "ear to ear." The deputies tried to enter the apartment through the front door but it was locked. When they asked in Spanish for someone to come to the door, J.A. appeared at the broken front window and said, "Help me." The deputies eventually got into the apartment, and found appellant lying on top of the victim. J.A. and his younger brother, B.M., were standing about five feet from Jackie's body. J.A.'s socks were soaked in his mother's blood. Deputy Britannia Hulse took both children out of the house and tried to remove J.A.'s socks to prevent him from seeing the blood, but he told her that appellant had just killed his mother and "that was the blood that fell out of her."

7

Appellant had cuts on both wrists and his neck and they were open but they did not appear to be bleeding or life-threatening. Appellant was taken to the hospital and after he was released, he was booked into custody at the sheriff's station. A deputy unfamiliar with the case was guarding appellant at the hospital when appellant told the deputy that he was upset because "Jackie had told him that [B.M.] wasn't his son at one point" but appellant appeared to the deputy to believe that B.M. was his son. The deputy testified that appellant was coherent and responding appropriately and, although appellant's breath smelled of alcohol, he did not give any indication that he was extremely intoxicated.[6]

According to the police officer who interviewed appellant, appellant stated that he had a conversation with Jackie claiming B.M. "was not his son three days prior to the day that he killed her." The morning prior to her death, on May 4th, appellant had gone to Jackie's apartment and she told appellant, "He looks just like you. That is your son." Appellant gave the officer three reasons for killing Jackie: first, she told appellant B.M. was not his son; second, Jackie would not take him back; and three, Jackie was seeing someone else.

An expert on domestic violence testified for the prosecution and explained domestic violence is a pattern of coercive behavior that is designed to control the victim's relationships to the outside world, where she goes, how she dresses, who she talks to, how she behaves, how her hair is cut and may involve control of every aspect of the victim's life. Studies show that the highest danger to a battered woman is when the woman tries to leave the abuser because the abuser becomes absolutely obsessed about getting her back to restore his sense of masculinity by getting everything back under control. Adrenaline pumps through the abuser as he goes through everything the woman has done to him during the course of their relationship. The abuser eventually gives himself "permission to crash through this mythical membrane that we all have that

---

[6] Police found five empty beer cans in appellant's car.

8

separates out violent thoughts from violent actions." The abuser justifies what he does because he sees himself as the victim.

## II.  Defense Evidence

The defense did not present any evidence.

## III.  Conviction and Sentencing

The jury convicted appellant in count 1 of first degree murder under section 187, subdivision (a), and in count 2 of first degree burglary with a person present under section 459. The jury also found to be true a special allegation that appellant had used a deadly and dangerous weapon, a box cutter, in the commission of both counts. On count 1, appellant was sentenced to a term of 25 years to life in state prison, plus one year for the deadly weapon enhancement and, on count 2, appellant was sentenced to four years in state prison plus one year for the deadly weapon enhancement. The court stayed the sentence on count 2 pursuant to section 654. The court granted appellant 827 days of custody credit and imposed various fines and fees.

Appellant timely filed a notice of appeal.

## LEGAL DISCUSSION

On appeal, appellant raises two arguments. First, he argues that the trial court abused its discretion when it failed to conduct a hearing into whether two jurors had prejudged the matter prior to the completion of evidence. Second, he argues that insufficient evidence supported the jury's true finding on the personal use of a weapon in the commission of the residential burglary in count 2. We affirm.

## I.  Trial Court Did Not Abuse Its Discretion in Addressing the Alleged Juror Misconduct.

### a.  Factual Background

At the end of the half-day court session on the second day of evidence, the trial court discussed two juror communications with counsel. "Juror number 1 expressed a concern that things are too graphic and that juror is not handling things well." The trial court noted that it appreciated that the prosecutor was not going to put pictures of the

9

victim on a projection screen but also noted that, while some jurors may "want to exam photographs at length," other jurors are "satisfied with the testimony" and "don't need to see the condition of the victim" and asked the prosecutor to "be mindful that some people are a bit more sensitive to that than others."

Next, Juror No. 8 wrote, "'At the beginning of the trial I believed I could fairly try this case. But after the testimony of the young boy and the emotions in the court. I don't believe I can do so. [¶] It is not fair to the defendant. But I feel my emotions will affect my verdict. I ask to please be excused, if possible.'" The court then stated:

"At this point, I'm not inclined to excuse Juror number 8. I do want to bring Juror number 8 in though, to speak to that person.

"So tomorrow at some point, we'll talk to this juror outside the presence of the other jurors.

"Quite frankly, I think that it's human nature to have that knee jerk reaction that you feel emotional hearing all of these things, as you both acknowledged; obviously when children are involved and we're talking about a violent crime, it can get emotional for people.

"But I also find that after a good night's sleep and if I bring in the juror and talk about their duties, that oftentimes, the initial 'I can't do this' attitude changes.

"Obviously, they haven't heard all the evidence; they haven't heard any of the law. So I would like to at least inquire of Juror number 8 if that's okay with both of you?" Both counsel replied in the affirmative.

The next morning, the trial court told counsel that it wanted to get their thoughts on an admonition to the entire jury regarding the graphic and emotionally charged nature of the testimony from J.A. The court suggested to counsel that the court put in writing a general admonition to the jury stating that the court understood that the case was emotional and that that was okay, that as both attorneys had noted in opening argument the jurors were human and would feel emotions, but the jurors could not base their decision on those emotions. The court noted it did not want the jurors one by one to tell the court that an aspect of the trial really got to them as the court expected that would be

10

the case. The court also expected that as it instructed them on the law, "that they will be able to follow that." The court then asked for counsel's thoughts, and the prosecutor responded that he thought it was "perfectly reasonable" and defense counsel stated she agreed.

Later that morning, the trial court asked defense counsel if she had read the draft jury admonition and she indicated that she had read the admonition, it was acceptable to her, and she did not have any changes.

At the end of the afternoon session, the trial court gave the admonition to the jury:

"Ladies and gentleman of the jury, I received notes from a couple of the jurors yesterday, indicating the concern about the nature of the testimony so far.

"I want to begin by acknowledging what the attorneys already said in their opening statements. [¶] By definition, this is an emotional case. A woman died. Her children were present when it happened. [¶] As human beings, it will naturally stir up emotions in all of us. It's normal for you to feel those emotions. [¶] The fact that you have those feelings does not mean that you cannot perform your duties as jurors. It only means that you are empathic [*sic*] people.

"I have had a conversation with the attorneys about the publications of photos in this case. No one is trying to traumatize you by showing you graphic photographs. [¶] However, photographs of the wounds inflicted have been received into evidence. It is your duty to conscientiously weigh all of the evidence in this case. [¶] How much or how little you choose to expose yourself to the crimes [*sic*] scene and coroner photographs is up to you. [¶] Some jurors like to study photographs extensively; others are satisfied with the witness' descriptions. We are trying [*sic*] be respectful of those differences by not overexposing you to particularly graphic photos here in court. [¶] . . . [¶]

"You cannot allow mere sympathy, passion or prejudice to impact your ability to follow the law. You may have a strong emotional response to some of the evidence received. However, you cannot let your emotions influence your verdicts in this case. [¶] You cannot disregard the law simply because of that emotion."

11

### b. Applicable Law

Preliminarily, we reject appellant's contention that we should conduct a de novo review of whether the trial court erred by failing to make a reasonable inquiry of the two jurors. The cited United States Supreme Court case did not involve a juror misconduct issue (*Ornelas v. United States* (1996) 517 U.S. 690, 696-697) and the California Supreme Court has applied an abuse of discretion standard in the relevant case law. (See, e.g., *People v. Burgener* (1986) 41 Cal.3d 505, 520; *People v. Engelman* (2002) 28 Cal.4th 436, 442; *People v. Martinez* (2010) 47 Cal.4th 911, 942.)

We also do not agree with respondent's contention that appellant has forfeited this issue on appeal. The trial court has a duty to conduct a reasonable inquiry into juror misconduct consistent with defendant's right to a fair trial. (*People v. Engelman*, *supra*, 28 Cal.4th at p. 442; *People v. Cowan* (2010) 50 Cal.4th 401, 506-507 ["Accordingly, because defendant's claim is that the trial court erred by failing, sua sponte, to conduct an adequate inquiry, no trial court action by the defense was required to preserve the claim"].)

"[T]he court does have a duty to conduct reasonable inquiry into allegations of juror misconduct or incapacity—always keeping in mind that the decision whether (and how) to investigate rests within the sound discretion of the court." (*People v. Engelman*, *supra*, 28 Cal.4th at p. 442.) A trial court does not have a duty to investigate every possible instance of juror misconduct. (*People v. Hedgecock* (1990) 51 Cal.3d 395, 419.) "'"[A] hearing is required only where the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his duties and would justify his removal from the case."'" (*People v. Martinez*, *supra*, 47 Cal.4th at p. 942.) A defendant is not entitled to such a hearing as a matter of right. (*People v. Dykes* (2009) 46 Cal.4th 731, 809.)

Here, we do not agree that the trial court abused its discretion when it decided against speaking with Juror Nos. 1 and 8 individually. In order to justify investigation, there must be more than mere speculation of juror misconduct. The juror's inability to perform must appear as a "demonstrable reality." (*People v. Williams* (1997) 16 Cal.4th

12

153, 231.)  Here, defendant failed to show "'a strong possibility that prejudicial misconduct ha[d] occurred.'"  (*People v. Brown* (2003) 31 Cal.4th 518, 582.)  The two jurors expressed very understandable emotional reactions to the evidence of Jackie's violent death, especially listening to the testimony from J.A. describing his unsuccessful attempt to help his mother before he witnessed her killing when he was just seven years old.  Although appellant argues the two jurors engaged in misconduct by "reaching a conclusion without hearing all the evidence," the Supreme Court has noted that a juror who forms an opinion regarding the strength of the prosecution's case before the start of deliberations has not necessarily prejudged the case.  "The reality that a juror may hold an opinion at the outset of deliberations is . . . reflective of human nature.  It is certainly not unheard of that a foreperson may actually take a vote as deliberations begin to acquire an early sense of how jurors are leaning.  We cannot reasonably expect a juror to enter deliberations as a *tabula rasa*, only allowed to form ideas as conversations continue.  What we can, and do, require is that each juror maintain an open mind, consider all the evidence, and subject any preliminary opinion to rational and collegial scrutiny before coming to a final determination."  (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 75, citation omitted.)

We conclude that the trial court was within its discretion in deciding to respond to Juror Nos. 1 and 8's concerns by speaking to the entire jury about the emotional nature of the case and then instructing them that they could not allow their emotions to influence their verdict or to disregard the law because of emotion.

## II.     Substantial Evidence Supported the Finding that Appellant Used a Weapon in the Burglary Count.

Appellant contends that the evidence was insufficient to prove the section 12022, subdivision (b)(1) allegation that he personally used a box cutter during the commission of the burglary.  In particular, he argues that there was no evidence that he used the box cutter to effect the entry into Jackie's apartment that is the essence of the crime of burglary.  We disagree.

13

We apply the substantial evidence standard, examining the evidence in the light most favorable to the judgment, and determining whether the evidence is reasonable, credible, and of solid value so as to allow a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. (*People v. Prince* (2007) 40 Cal.4th 1179, 1251.) The question is not whether we believe that the evidence establishes guilt beyond a reasonable doubt; instead, we review the evidence favorably to the prosecution to determine whether any rational jury could have reached the verdict that it did. (*Jackson v. Virginia* (1979) 443 U.S. 307, 318-319 [99 S.Ct. 2781, 61 L.Ed.2d 560].) "'If this "substantial" evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment will be affirmed.'" (*In re Gustavo M.* (1989) 214 Cal.App.3d 1485, 1497.) We examine the bare legal sufficiency of the evidence, not its weight. (*People v. Moye* (2009) 47 Cal.4th 537, 556.)

Section 12022, subdivision (b)(1) states, in pertinent part: "Any person who personally uses a deadly or dangerous weapon in the commission of a felony . . . shall be punished by an additional and consecutive term of imprisonment pursuant in the state prison for one year . . . ."

The crime of burglary is committed when a person enters any building with the intent to commit larceny or any felony. (§ 459.) Although the prosecution need not prove anything further to establish the crime, "this does not dictate the conclusion that the crime is complete for all purposes precluding consideration of the acts and conduct of the intruder after entry as part of the commission of the crime, or that the crime ends upon entry and cannot continue while he is unlawfully on the premises. (*People v. Walls* (1978) 85 Cal.App.3d 447, 453.) Thus, courts have held that for firearm and other enhancements, a theft crime such as burglary "continue[s] beyond the time of the physical conduct constituting the offense until the perpetrator has reached a place of temporary safety. Accordingly, one who employs a [deadly weapon] at any time on the continuum between the initial step of the offense and arrival at a place of temporary safety is subject to the enhancement." (*People v. Taylor* (1995) 32 Cal.App.4th 578, 582 [involving firearm enhancement]; *Walls*, *supra*, 85 Cal.App.3d at pp. 450-451 [same];

14

*People v. Funtanilla* (1991) 1 Cal.App.4th 326, 331, disapproved on another ground in *People v. Masbruch* (1996) 13 Cal.4th 1001.)

As the court in *Walls* explained, to hold otherwise "would lead to the anomalous result that before a burglary sentence can be enhanced under these statutes, the firearm must have been used by the intruder, or he must have inflicted great bodily injury at the very moment he stepped over the threshold or while trying to effect entry to the premises, a result not only unreasonable but one that defeats the obvious purpose of the statute to offer protection to potential burglary victims on the premises." (*Walls*, *supra*, 85 Cal.App.3d at pp. 453-454, italics omitted.) This logic applies to a section 12022, subdivision (b) enhancement as well.

Here, the appellant attacked Jackie with the box cutter after breaking into her apartment and had not left the premises. Accordingly, we affirm the section 12022, subdivision (b) enhancement.

## DISPOSITION

We affirm the judgment.

NOT TO BE PUBLISHED.

CHANEY, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.[*]

_____

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.